# BUCHANAN *v.* KENTUCKY

No. 85–5348.   Argued January 12, 1987—Decided June 24, 1987

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, O'CONNOR, and SCALIA, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, and in Part I of which STEVENS, J., joined, *post*, p. 426.

*Kevin M. McNally*, by appointment of the Court, 479 U. S. 1015, argued the cause for petitioner. With him on the briefs were *C. Thomas Hectus* and *M. Gail Robinson.*

*David A. Smith*, Assistant Attorney General of Kentucky, argued the cause for respondent. With him on the briefs were *David L. Armstrong*, Attorney General, *C. Lloyd Vest II*, Assistant Attorney General, and *Ernest A. Jasmin*, Special Assistant Attorney General.*

---

*A brief of *amici curiae* urging affirmance was filed for the State of Arkansas et al. by *Michael C. Turpen*, Attorney General of Oklahoma, *David W. Lee* and *Susan Stewart Dickerson*, Assistant Attorneys General, *John Steven Clark*, Attorney General of Arkansas, *John J. Kelly*, Chief

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents two narrow issues arising out of petitioner Buchanan's trial for murder. First, it poses the question whether petitioner was deprived of his right to an impartial jury, representative of a fair cross section of the community, because the Commonwealth of Kentucky was permitted to "death-qualify" the jury in his joint trial where the death penalty was sought against his codefendant. Second, the case raises the question whether the admission of findings from a psychiatric examination of petitioner proffered solely to rebut other psychological evidence presented by petitioner violated his Fifth and Sixth Amendment rights where his counsel had requested the examination and where petitioner attempted to establish at trial a mental-status defense.[1]

State's Attorney of Connecticut, *Charles M. Oberly III*, Attorney General of Delaware, *Jim C. Smith*, Attorney General of Florida, *Michael J. Bowers*, Attorney General of Georgia, *C. William Ullrich*, Acting Attorney General of Guam, *Corinne K. A. Watanabe*, Attorney General of Hawaii, *Neil F. Hartigan*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *Robert T. Stephan*, Attorney General of Kansas, *William J. Guste, Jr.*, Attorney General of Louisiana, *Edward Lloyd Pittman*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Robert M. Spire*, Attorney General of Nebraska, *Lacy H. Thornburg*, Attorney General of North Carolina, *Dave Frohnmayer*, Attorney General of Oregon, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *T. Travis Medlock*, Attorney General of South Carolina, *W. J. Michael Cody*, Attorney General of Tennessee, *Mary Sue Terry*, Attorney General of Virginia, and *Kenneth O. Eikenberry*, Attorney General of Washington.

[1] In his brief, petitioner advances three additional claims: (1) an alleged violation of the First Amendment rights of the jurors not selected for his jury; (2) an alleged equal protection violation with respect to those jurors; and (3) a challenge to the actual "death-qualification" procedure used in this case. Brief for Petitioner 32–39. These claims were not properly presented to the Supreme Court of Kentucky, were not addressed by it, and were not included as questions in the petition for certiorari. See this Court's Rule 21.1(a). We therefore need not, and do not, reach these claims. See *Hill* v. *California*, 401 U. S. 797, 805–806 (1971); *Cardinale* v. *Louisiana*, 394 U. S. 437, 438 (1969).

## I

Shortly after midnight on January 7, 1981, police in Louisville, Ky., discovered the partially clad body of 20-year-old Barbel C. Poore in the backseat of her automobile. The young woman had been sexually assaulted and shot twice in the head. The discovery was occasioned by a report to the police from Poore's mother, who had driven by the gas station where her daughter worked, after Poore failed to return home at the expected time, and who found the station unattended and unlocked. Tr. 399 (Aug. 2–13, 1982). The ensuing police investigation led to the arrest of Kevin Stanford, Troy Johnson, and petitioner, David Buchanan, a juvenile.

From the confessions of these participants, including that of petitioner, the events surrounding the murder were reconstructed: Petitioner first approached Johnson with a plan to rob the gas station, and obtained from him a gun and bullets owned by Johnson's brother. *Id.*, at 1031. Petitioner then telephoned Stanford, who lived in an apartment complex next to the station, and proposed the plan to him. *Id.*, at 1032. Johnson and petitioner proceeded to the parking lot of the apartment complex where they met Stanford. Petitioner told Johnson to wait in the car while he and Stanford approached the station. *Id.*, at 484, 1033. Petitioner and Stanford entered the station office, with Stanford carrying the gun. While petitioner attempted to locate and then to open the safe, Stanford took Poore into the interior restroom and raped her. *Id.*, at 484–485. After petitioner failed to open the safe, he joined Stanford and the two took turns raping and sodomizing Poore despite her plea to petitioner that the assault cease. *Id.*, at 485, 1044.

Approximately a half hour after leaving Johnson, petitioner returned to the car carrying a can of gasoline which he placed in its backseat. After telling Johnson to continue to wait, *id.*, at 1034, petitioner left for the station. He came back to the car once again, entered it, and ordered

Johnson to drive to a location, a short distance from the station, where Stanford had driven Poore in Poore's car in order, as petitioner put it, "[t]o have some more sex with her." *Id.*, at 1037. Petitioner got out of Johnson's car and approached Stanford, who was standing beside the driver's side of Poore's vehicle. *Ibid.* As petitioner watched, Stanford shot Poore in the face and then, as petitioner started to return to Johnson's car, in the back of the head. *Id.*, at 486, 1037–1038.

While Johnson was held over in juvenile court,[2] petitioner and Stanford were transferred to the Circuit Court of Jefferson County and were indicted for capital murder and other charges arising out of events surrounding the murder.[3] The Commonwealth proceeded to try petitioner and Stanford

---

[2] In juvenile court Johnson pleaded guilty to accomplice liability, Tr. 1029 (Aug. 2–13, 1982), in exchange for becoming a witness for the Commonwealth.

[3] The applicable Kentucky murder statute at the time of petitioner's trial provided:

"(1) A person is guilty of murder when:

(a) With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. However, nothing contained in this section shall constitute a defense to a prosecution for or preclude a conviction of manslaughter in the first degree or any other crime; or

(b) Under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person.

(2) Murder is a capital offense." Ky. Rev. Stat. § 507.020 (Supp. 1977). Subparagraph (b) was amended in 1984 in a minor particular having no application to petitioner. See 1984 Ky. Acts, ch. 165, § 26, effective July 13, 1984.

Petitioner and Stanford were both charged with murder, first-degree robbery, and sodomy. In addition, Stanford was charged with receiving stolen property, and petitioner with rape and kidnaping. App. 2.

jointly.[4]   Petitioner did not request that his trial be severed from Stanford's.[5]   In two pretrial motions, he did request that the jury not be "death qualified,"[6] and that there be

---

[4] Kentucky Rules of Criminal Procedure (1986) provide for the joinder of offenses and defendants at trial.   Rule 9.12 states in pertinent part:

"The court may order two (2) or more indictments, informations, complaints or uniform citations to be tried together if the offenses, and the defendants, if more than one (1), could have been joined in a single indictment, information, complaint or uniform citation.   The procedure shall be the same as if the prosecution were under a single indictment, information, complaint or uniform citation."

Rule 6.18, which deals with the joinder of offenses, provides:

"Two (2) or more offenses may be charged in the same complaint or two (2) or more offenses whether felonies or misdemeanors, or both, may be charged in the same indictment or information in a separate count for each offense, if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan."

Rule 6.20, concerning joinder of defendants, allows such joinder in the following situation:

"Two (2) or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.   Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count."

These Rules were applicable in this case.

[5] Rule 9.16 of the Kentucky Rules of Criminal Procedure permits a defendant to file a motion for severance on the ground that the joint trial might be unduly prejudicial.   See *Commonwealth* v. *Rogers*, 698 S. W. 2d 839 (Ky. 1985).   In Kentucky the trial judge has considerable discretion whether to permit the severance.   *Wilson* v. *Commonwealth*, 695 S. W. 2d 854, 858 (Ky. 1985).   Although Stanford moved for a severance, App. 26, petitioner apparently did not view this as beneficial to him and made no such request.   See Tr. of Oral Arg. 27.   At one point, the trial judge ruled that an objection by counsel for one defendant would be regarded as an objection by the counsel for the other, App. 28, but this ruling was made in the context of selecting a jury and after Stanford's motion for severance was denied.

[6] A "death-qualified" jury is one from which prospective jurors have been excluded for cause in light of their inability to set aside their views

two juries, one for guilt and the other for sentencing, with the first not being "death qualified." App. 5, 8. In essence, he argued that the "death qualification" of the jury prior to the guilt phase violated his right to an impartial jury drawn from a fair cross section of the community in violation of the Sixth and Fourteenth Amendments. *Id.*, at 6, 9. The court denied both motions. Petitioner filed another pretrial motion seeking dismissal of the capital portion of the indictment against him on the basis that Stanford had been the trigger-man, that petitioner had no intent to kill Poore, and that therefore, under *Enmund* v. *Florida*, 458 U. S. 782 (1982),[7] petitioner could not be sentenced to death. App. 19, 22. Without opinion and with no objection from the prosecution, the court granted this motion. *Id.*, at 24. At *voir dire*, petitioner renewed his earlier motions as to "death quali- fication," emphasizing that he was no longer subject to the death penalty. *Id.*, at 26–27. The court again denied these motions.

At trial, petitioner attempted to establish the affirmative defense of "extreme emotional disturbance."[8] He called as

---

about the death penalty that "would 'prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] instruc- tions and [their] oath.'" *Wainwright* v. *Witt*, 469 U. S. 412, 424 (1985), quoting *Adams* v. *Texas*, 448 U. S. 38, 45 (1980). The prosecutor may re- move such potential jurors according to the guidelines set out in *Wither- spoon* v. *Illinois*, 391 U. S. 510 (1968), as refined by the decision in *Witt*. For the sake of shorthand, see *Lockhart* v. *McCree*, 476 U. S. 162 (1986), jurors properly excluded are called "*Witherspoon*-excludables."

[7] In *Enmund*, this Court held that the death penalty would be invalid, under the Eighth and Fourteenth Amendments, for an individual "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U. S., at 797.

[8] At the time of the offense, the settled law in Kentucky was that this defense was available only where the defendant established two elements: that the defendant had been provoked, and that the defendant had acted in a subjectively reasonable way given this provocation. See *Gall* v. *Com- monwealth*, 607 S. W. 2d 97, 108–109 (Ky. 1980); *Wellman* v. *Common-*

his sole witness a social worker, Martha Elam, who formerly had been assigned to his case. At the request of petitioner's counsel, she read to the jury from several reports and letters dealing with evaluations of petitioner's mental condition.[9]

---

*wealth*, 694 S. W. 2d 696, 697–698 (Ky. 1985). The defendant has the burden of production on this defense, see *Gall, supra*, at 109, which cannot be established simply by a showing of mental illness, see *Wellman, supra*, at 697.

[9] As a result of a previous arrest on a burglary charge, petitioner, in May 1980, had been placed by the Kentucky Department of Human Resources in the Danville Youth Development Center. App. 38, 40. There he received a psychological examination, the report of which Elam first read during the trial. *Id.*, at 39–41. In this report, among other things, the psychologist made the following observations:

"[Petitioner's] responses to projective tests suggest an individual who is isolated, mistrustful of others and interpersonally deficient. His reproductions of the Bender designs are indicative of emotional disturbance. Along with his test behavior and flat affect, his pattern of test responses suggest[s] a mild thought disorder. He is likely to deal with his thought disturbance in a sociopathic manner. Although he tends to withdraw from others, when pushed, he becomes hostile.

*"Recommendations:*

"[Petitioner's] emotional disturbance and his resentment of his placement at the Danville Youth Development Center appear to militate against his success in this program." *Id.*, at 62–63.

Given this recommendation, petitioner, in July 1980, was transferred to the Northern Kentucky Treatment Center, an institution for emotionally disturbed youths. *Id.*, at 41. There petitioner received another psychological examination, which reads, in pertinent part:

"[Petitioner] presents as a quiet, rather withdrawn and at least moderately depressed sixteen-year-old black youth. He is oriented for time, place, and person. His thinking, however, is extremely simplistic and very concrete. Impulse controls under even minimal stress are felt to be very poor. He is not seen as sophisticated, but rather as a very dependent, immature, probably pretty severely emotionally disturbed, and very easily confused youth. Short-term auditory and visual memory skills are impaired. [Petitioner] has extremely limited capacity for insight. Judgment is impaired. Interactions with peers is *[sic]* likely to be extremely superficial and very guarded. [Petitioner] uses the psychological defenses of projection, denial, rationalization, and isolation extensively. He will be

On cross-examination, the prosecutor had Elam read another progress report made while petitioner was institutionalized.[10] The prosecutor then sought to have Elam read from a report of a psychological evaluation made by Doctor Robert J. G. Lange while petitioner was within the jurisdiction of the juvenile court after his arrest for Poore's murder. Counsel for petitioner and the prosecutor jointly had moved the juvenile court to order this evaluation under Ky. Rev. Stat.

---

easily led by other more sophisticated delinquents or youths. He has very limited interpersonal skills and is likely to be seen by other youth as a pawn to be used.

"[Petitioner's] human figure drawings are extremely bizarre. Combined with his flat affect and depressed mood, as well as other suggestions of a cognitive or thought disorder, it is felt that this individual has the potential for developing a full blown schizophrenic disorder. At the present time, he is at least extremely mistrustful, suspicious, and even paranoid. He is in need of ongoing extensive mental health intervention in addition to a highly structured but minimally stressful, from a psychological point of view, residential environment.

"In view of the presence of extreme unmet dependency needs, early and sustained frustration, and minimal success in almost any endeavor there exists the strong probability that underlying considerable passivity and withdrawal is extensive anger and perhaps even rage. Thus, under the proper circumstances, [petitioner] could be expected to be dangerous with respect to acts against persons. While this has not been a part of his history, it needs to be considered with respect to future treatment and eventual disposition." *Id.*, at 65.

Elam also read this report at trial. *Id.*, at 44–45. A month after this evaluation was made, it was noted in petitioner's progress report: "All attempts to motivate [petitioner] toward self improvement have been unsuccessful." *Id.*, at 68 (read by Elam, *id.*, at 46). Less than three weeks later, on Oct. 10, 1980, a Department of Human Resources official notified the juvenile judge in charge of petitioner's case that petitioner was being released into the community, with the observation that "[a]lthough we cannot predict future behavior, we certainly feel that [petitioner] is better able to cope with personal problems." *Id.*, at 70 (read by Elam, *id.*, at 48).

[10] The report read: "As a result of this evaluation, he was determined to be a fairly sophisticated youth who would be capable of manipulative, conning type behaviors. He was placed into one of our more mature sophicated *[sic]* groups of counselling." *Id.*, at 55.

§§ 202A.010–202A.990 (1977), which, at the time, governed involuntary hospitalization for psychiatric treatment.[11]

When petitioner objected on the basis that Doctor Lange's evaluation had nothing to do with petitioner's emotional disturbance but only with his competency to stand trial, App. 55, the prosecutor responded that this report dealt with the same matters petitioner already had explored by having Elam read the earlier reports. Petitioner also contended that such an introduction would violate his Fifth and Sixth Amendments rights because his counsel had not been present during

---

[11] Although there was some confusion initially over who had requested the examination, see Supplemental Brief for Respondent 3 (suggesting that petitioner's counsel had made the request), it now appears that it resulted from a joint motion of the prosecutor and petitioner's counsel. Reply Brief for Petitioner 28; Tr. of Oral Arg. 22. The statute provided criteria for involuntary hospitalization:

"If after their examination the physicians certify that the respondent is a mentally ill person who presents an immediate danger or an immediate threat of danger to self or others as a result of mental illness and that he can reasonably benefit from treatment and that hospitalization is the least restrictive alternative mode of treatment presently available, then such person may be retained in the hospital pending a hearing and order of the appropriate court, or may be transported to an appropriate hospital for retention." Ky. Rev. Stat. § 202A.070(5) (1977).

The purpose of a motion made pursuant to this provision is to enable a defendant to receive psychiatric treatment, *not* to determine his competency to stand trial. The latter is governed by another statutory procedure. See Ky. Rule Crim. Proc. 8.06 (1986); Ky. Rev. Stat. §§ 504.090–504.110 (1985); see also B. Milward, Kentucky Criminal Practice §§ 35.01–35.05 (1983). In fact, according to petitioner's counsel, one of the motives for his motion was to have petitioner receive treatment while petitioner was awaiting trial. Reply Brief for Petitioner 28, n. 21. In making his report, however, Doctor Lange also expressed an opinion as to petitioner's competency to stand trial. App. 73. Perhaps, in light of this opinion, the Kentucky Supreme Court mistakenly labeled Doctor Lange's examination as one for the purposes of determining whether petitioner was competent to stand trial. See 691 S. W. 2d 210, 213 (1985).

The trial court also ordered a psychological evaluation of petitioner for competency purposes but kept the report confidential from both sides and used it only for its own determination. Tr. 10–11 (Dec. 18, 1981).

the evaluation and petitioner had not been informed that the results could be used against him at trial. *Id.*, at 57–58. Not persuaded by petitioner's arguments, the court permitted Elam to read an edited version of the report,[12] with the observation that "you can't argue about his mental status at the time of the commitment of this offense and exclude evidence when he was evaluated with reference to that mental status." *Id.*, at 56.

Petitioner was found guilty on all charges and, pursuant to Kentucky procedure, the jury determined the sentence.[13]

---

[12] The edited version, read by Elam, App. 58–59, did not include the section of the report where Doctor Lange referred to petitioner's competency to stand trial. It stated:

"At the initiation of the interview, [petitioner] was slightly apprehensive about why I was there, but the explanation offered soon allayed his anxiety and he relaxed. Rapport was reasonably good, eye contact adequate and [petitioner] was appropriate interactionally in the context of the setting. He was neither especially hostile or friendly, mainly tolerant and cooperative. The discussion focused on the here and now, since the goal was to ascertain meeting of 202a criteria, or not. He was in good reality contact, had reasonable knowledge of current events outside the Center, and seemed to be functioning in the dull normal IQ range. Short and long term memory appeared intact. There was no evidence of hallucinations or delusions. Affects was *[sic]* generally shallow, without emphoria *[sic]* or dysphoria. He seemed somewhat optimistic about the outcome of the changes *[sic]* pending against him. No suicidal ideation is present, though [petitioner] states he has at times been very angry at certain people (staff) at the 'Center' and thought about hurting them. [Petitioner] wasn't especially anxious or restless except initially, and seemed overall relaxed." App. 72–73.

[13] In Kentucky, the jury making the guilt or innocence determination for the felony defendant also determines the punishment to be imposed within the limits fixed by statute. See Ky. Rule Crim. Proc. 9.84(1) (1986); Ky. Rev. Stat. § 532.060 (1985); K. Brickley, Kentucky Criminal Law § 29.01 (1974); Milward, *supra*, at §§ 49.01–49.03. The present Kentucky procedure, not available at the time of petitioner's trial, provides for a separate sentencing hearing before the jury with the presentation of specific evidence by the Commonwealth, such as the defendant's prior acts, and of mitigating evidence by the defendant. See Ky. Rev. Stat. § 532.055 (Supp. 1986).

The jury imposed the maximum sentence on each charge, with the sentences to be served consecutively. *Id.*, at 76–77. The court accepted the sentences but made them run concurrently with the length of the longest term, a life sentence, authorized on the murder charge. See Tr. of Hearing 4–5 (Sept. 14, 1982); Ky. Rev. Stat. § 532.110 (Supp. 1986).[14] Stanford was sentenced to death on the murder charge by the same jury.[15]

The Supreme Court of Kentucky affirmed petitioner's conviction and sentences. 691 S. W. 2d 210 (1985). Among other things, the court rejected petitioner's contention that the "death qualification" of the jury deprived him of his right to an impartial jury drawn from a fair cross section of the community. In its view, a "death-qualified" jury was not "extra-ordinarily conviction-prone," *id.*, at 211; rather, "[a] death-qualified panel tends to ensure those who serve on the jury [will] be willing and able to follow the evidence and law rather than their own preconceived attitudes." *Id.*, at 212. It also stated that persons who are excluded from a jury panel because of their opposition to the death penalty do not constitute a "cognizable group" for the purposes of a fair cross section analysis. *Ibid.*

The court, moreover, rejected petitioner's contention that the trial judge erred in allowing the prosecutor to introduce

---

[14] Pursuant to Ky. Rev. Stat. § 532.070(1) (1985), the trial court may reduce a jury sentence for a felony conviction when it believes that it is "unduly harsh." Under the Kentucky procedure applicable at the time of petitioner's trial, after receiving a jury verdict and sentence, the trial judge conducted a sentencing hearing where he considered a previously prepared presentence report, see Ky. Rev. Stat. § 532.050 (1985), whose contents may be controverted by the defendant. See Brickley, *supra*, at § 29.02; Milward, *supra*, at § 49.02.

[15] Under Kentucky law, when a capital defendant is convicted by a jury, he is sentenced by the same jury after a separate sentencing hearing. Ky. Rev. Stat. § 532.025(1)(b) (Supp. 1986); see also Milward, *supra*, at § 49.12. After receiving the jury's sentencing recommendation, the trial judge fixes the sentence. § 532.025(1)(b).

Doctor Lange's report through cross-examination of Elam. It observed that petitioner had "opened the door for the introduction of the competency report by introducing only those DHR reports which were beneficial to him." *Id.*, at 213. It found irrelevant the fact that Doctor Lange had prepared his report in connection with the inquiry into petitioner's competency to stand trial (as we have observed, see n. 11, *supra*, the court misunderstood the purpose of Doctor Lange's examination). In addition, the court concluded that the introduction of the report did not violate petitioner's Fifth Amendment privilege against self-incrimination under *Estelle* v. *Smith*, 451 U. S. 454 (1981). The court reasoned that in *Smith* the defendant's remarks to the examiner were incriminatory, whereas "[i]n this case, the report contained no inculpatory statements by [petitioner] or any accusatory observation by the examiner who merely recited his observations of [petitioner's] outward appearance." 691 S. W. 2d, at 213. Alternatively, the court observed that, if the admission of the competency report had been an error, it was harmless, given petitioner's confession and the overwhelming evidence of his guilt. *Ibid.*

Because of the nature of the issues involved, we granted certiorari, 476 U. S. 1140 (1986).

## II

Last Term, in *Lockhart* v. *McCree*, 476 U. S. 162 (1986), this Court held that the Constitution does not "prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial." *Id.*, at 165. In particular, the Court rejected McCree's contention that "death qualification" prior to the guilt phase of the trial violated his right under the Sixth and Fourteenth Amendments to an impartial jury selected from a representative cross section of the community. *Id.*, at 178, 184. The decision in *McCree* controls the

instant case. In fact, petitioner advances here many arguments identical to those expressly rejected in *McCree*.[16]

## A

The Court's reasoning in *McCree* requires rejection of petitioner's claim that "death qualification" violated his right to a jury selected from a representative cross section of the community. It was explained in *McCree* that the fair cross section requirement applies only to venires, not to petit juries. *Id.*, at 173. Accordingly, petit juries do not have to "reflect the composition of the community at large." *Ibid.* More importantly, it was pointed out that, even if this requirement were applied to petit juries, no fair cross section violation would be established when "*Witherspoon*-excludables" were dismissed from a petit jury, because they do not constitute a distinctive group for fair cross section purposes. *Id.*, at 174.

The reasons given in *McCree* for the conclusion that "*Witherspoon*-excludables" are not such a group are equally pertinent here. In "death qualifying" the jury at petitioner's joint trial, the Commonwealth did not arbitrarily single out the "*Witherspoon*-excludables" for a reason unrelated to their ability to serve as jurors at the trial, as, for example, on the basis of race or gender. See *id.*, at 174–175. Rather, the Commonwealth excluded them in order to promote its interest in having a jury that could properly find the facts and apply the law at both the guilt and sentencing phases of the joint trial. Moreover, as was observed in *McCree*, the iden-

---

[16] There is no reason to revisit the issue whether social-science literature conclusively shows that "death-qualified" juries are "conviction-prone," although petitioner spends much effort in citing studies to that effect. See Brief for Petitioner 21–25. Most of those studies also were before the Court in *McCree*, see 476 U. S., at 169–170, nn. 4, 5; the Court's discussion of them there, see *id.*, at 168–171, need not be repeated here. In any event, just as it was assumed in *McCree* that the studies were "both methodologically valid and adequate to establish that 'death qualification' in fact produces juries *somewhat* more 'conviction-prone' than 'non-death-qualified' juries," *id.*, at 173 (emphasis added), we make a similar assumption here.

tification of a group such as the *"Witherspoon*-excludables" does not "create an 'appearance of unfairness,'" *id.*, at 176, because it is related to the Commonwealth's legitimate interest in obtaining a jury that does not contain members who are unable to follow the law with respect to a particular issue in a capital case. Similar reasoning applies in the context of petitioner's joint trial, for the *"Witherspoon*-excludables" would not have been able to assess properly the appropriateness of imposing the death penalty on codefendant Stanford.

Finally, in *McCree* it was emphasized that not all who oppose the death penalty are excludable for cause. Those who indicate that they can set aside temporarily their personal beliefs in deference to the rule of law may serve as jurors. Even those who are *"Witherspoon*-excludables" are not substantially deprived of "their basic rights of citizenship," because they are not prevented from serving as jurors in other criminal cases. *Ibid.* Although, as here, *"Witherspoon*-excludables" will be barred from participating in joint trials where the jury will be required to assess the appropriateness of the death penalty for one of the defendants, this incremental restriction on the ability of those individuals to serve on juries is not constitutionally impermissible.

The facts of the case at bar do not alter the conclusion that *"Witherspoon*-excludables" are not a distinctive group for fair cross section purposes. Thus, there is no violation of the Sixth Amendment's fair cross section requirement here.[17]

## B

The analysis in *McCree* also forecloses petitioner's claim that he was denied his right to an impartial jury because of the removal of *"Witherspoon*-excludables" from the jury at his joint trial. The Court considered a similar claim in *McCree* that was directed at the exclusion of such jurors

---

[17] Given this conclusion, there is no reason to address petitioner's description of the *result* of the "death qualification"—the race, sex, political party, and age composition of the jury in his case, see Brief for Petitioner 31, n. 52—a description that, in any event, is not part of the record.

prior to the guilt phase of a capital defendant's trial. *Id.*, at 179. It rejected McCree's claim that the impartial-jury requirement demanded a balancing of jurors with different predilections because that view was inconsistent with the Court's understanding that jury impartiality requires only "'jurors who will conscientiously apply the law and find the facts.'" *Id.*, at 178, quoting *Wainwright* v. *Witt*, 469 U. S. 412, 423 (1985). It reasoned that this balancing of juror viewpoints sought by McCree was impractical because it would require a trial judge to ensure "that each [jury] contains the proper number of Democrats and Republicans, young persons and old persons, white-collar executives and blue-collar laborers, and so on." 476 U. S., at 178.

The Court further explained in *McCree* that the State's interest in having a single jury decide all the issues in a capital trial was proper, and it distinguished that case from the situations in *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), and *Adams* v. *Texas*, 448 U. S. 38 (1980), where Illinois and Texas "crossed the line of neutrality" in striking a venire member who expressed any scruple about the death penalty. 476 U. S., at 179–180, quoting *Witherspoon*, 391 U. S., at 520. It also acknowledged the State's interest in the possibility that a defendant might benefit at the sentencing phase from any "'residual doubts'" about the evidence at the guilt phase that the jury might have had. 476 U. S., at 181. In addition, given that much of the same evidence would be presented at both phases of the capital trial, the Court thought appropriate the interest in not putting either the prosecution or the defense to the burden of having to present the evidence and testimony twice. *Ibid.* Finally, it distinguished McCree's claim from the situations presented in *Witherspoon* and *Adams* because it did not deal with "the special context of capital sentencing, where the range of jury discretion necessarily gave rise to far greater concern over the possible effects of an 'imbalanced jury.'" 476 U. S., at 182–183. In the guilt phase of McCree's trial, the jury's discretion was traditionally circumscribed. *Id.*, at 184.

Although petitioner contends that the Commonwealth's interests in having *"Witherspoon-*excludables" removed from his jury were minimal in comparison to the prejudice he suffered by being convicted and sentenced by this jury, Brief for Petitioner 26, and n. 42, these interests are similar to those identified in *McCree* and equally as compelling. Petitioner's primary error is his characterization of the issue presented here as affecting *his* trial, as opposed to the *actual* trial in this case—the joint trial of petitioner and Stanford. As demonstrated by the statutory provisions providing for joinder of offenses and defendants, see n. 4, *supra,* the Commonwealth has determined that it has an interest in providing prosecutors with the authority to proceed in a joint trial when the conduct of more than one criminal defendant arises out of the same events.

Underlying the Commonwealth's interest in a joint trial is a related interest in promoting the reliability and consistency of its judicial process, an interest that may benefit the non-capital defendant as well. In joint trials, the jury obtains a more complete view of all the acts underlying the charges than would be possible in separate trials. From such a perspective, it may be able to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each defendant in the sentencing. See ABA Standards for Criminal Justice Standard 13–2.2 (2d ed. 1980). This jury perspective is particularly significant where, as here, all the crimes charged against the joined defendants arise out of one chain of events, where there is a single victim, and where, in fact, the defendants are indicted on several of the same counts. Indeed, it appears that, by not moving to sever his case from that of Stanford, petitioner made the tactical decision that he would fare better if he were tried by the same jury that tried Stanford, the "triggerman" in Poore's murder.

The Commonwealth's interest in a joint trial also is bound up with a concern that it not be required to undergo the burden of presenting the same evidence to different juries

where, as here, two defendants, only one of whom is eligible for a death sentence, are charged with crimes arising out of the same events. Indeed, if petitioner's position—that, because a "death-qualified" jury is conviction prone and likely to mete out harsher sentences, it should be used only in the capital case—were accepted, its logic would lead to an anomalous result: if, as in Stanford's case, a capital defendant also is charged with noncapital offenses, according to petitioner there would have to be one trial for those offenses and another for the capital offense. Such a result would place an intolerable administrative burden upon the Commonwealth.[18]

Where, as here, one of the joined defendants is a capital defendant and the capital-sentencing scheme requires the use of the same jury for the guilt and penalty phases of the capital defendant's trial, the interest in this scheme, which the Court recognized as significant in *McCree*, 476 U. S., at 182, coupled with the Commonwealth's interest in a joint trial, ar-

---

[18] Given the significant state interests in having one jury for both the guilt and penalty phases of a joint trial, there is no reason to treat in any detail the alternatives to this procedure that petitioner proposes. See Brief for Petitioner 27–29. As it is, there is some conflict between these alternatives that reflects petitioner's ambiguity as to the exact nature of the relief he seeks: it is unclear whether he wishes to avoid a "death-qualified" jury at the guilt phase, the penalty phase, or both. For example, one alternative proposed by petitioner, see *id.*, at 28, to which he alluded at oral argument, see Tr. of Oral Arg. 44, would be to have one jury for the guilt phase for both defendants and for the penalty phase for petitioner (this jury being not "death qualified") and another "death-qualified" jury for the penalty phase for the capital defendant. On the other hand, there is the alternative, also acknowledged by petitioner at oral argument, see *id.*, at 46, of using a "death-qualified" jury for the guilt phase for both defendants and for the capital defendant's penalty phase, and another jury (not "death qualified") for petitioner's penalty phase. The latter alternative would guard against the alleged partiality of a "death-qualified" jury only insofar as this jury attribute would affect his sentence.

Whatever might be the proper focus of petitioner's demand for relief, the alternatives basically require the Commonwealth either to abandon the "death qualification" of juries at the guilt phase of a joint trial or to empanel an additional jury. We decline to place either burden on the Commonwealth.

gues strongly in favor of permitting "death qualification" of the jury.

Again, as in *McCree*, the particular concern about the possible effect of an " 'imbalanced' jury" in the "special context of capital sentencing," *id.*, at 182, is not present with respect to the guilt and sentencing phases of a noncapital defendant in this case. For, at the guilt phase, the jury's discretion traditionally is more channeled than at a capital-sentencing proceeding, and, at the penalty phase, the jury's sentence is limited to specific statutory sentences and is subject to review by the judge. See nn. 13 and 14, *supra*. In fact, the control of the judge over jury discretion in the noncapital-sentencing decision worked well in petitioner's case when the court ordered that his multiple sentences be served concurrently with the life sentence on the murder charge.[19]

Accordingly, petitioner's claim that a "death-qualified" jury lacks impartiality is no more persuasive than McCree's. As was stated in *McCree*, "the Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." 476 U. S., at 184. Given this presupposition and the significant interests in having a joint trial of petitioner and Stanford, there was no violation of petitioner's Sixth and Fourteenth Amendments right to an impartial jury.

_____

[19] Although petitioner suggests that rejection of his argument may lead prosecutors to request the death penalty in order to have the jury "death qualified," only to abandon this request at the penalty phase, see Brief for Petitioner 27, there is no evidence of prosecutorial action of this kind here. The prosecutor sought the death penalty against both petitioner and Stanford until the court granted, with the prosecutor's acquiescence, petitioner's motion to withdraw the ultimate penalty against him. App. 24. This determination was made *before* the commencement of *voir dire*. Moreover, in Kentucky the prosecutor can seek the death penalty *only* in a special class of capital cases where a statutory aggravating factor is present. See Ky. Rev. Stat. §§ 532.025(2)(a) and (3) (Supp. 1986).

## III

### A

This Court's precedent also controls petitioner's claim as to the prosecutor's use of Doctor Lange's report. In *Estelle* v. *Smith,* 451 U. S. 454 (1981), we were faced with a situation where a Texas prosecutor had called as his only witness at a capital-sentencing hearing a psychiatrist, who described defendant Smith's severe sociopathic condition and who expressed his opinion that it could not be remedied by treatment. *Id.,* at 459–460. The psychiatrist was able to give this testimony because he had examined Smith at the request of the trial judge, who had not notified defense counsel about the scope of the examination or, it seemed, even about the existence of the examination. *Id.,* at 470–471, and n. 15. Moreover, Smith's counsel neither had placed at issue Smith's competency to stand trial nor had offered an insanity defense. See *id.,* at 457, and n. 1, 458. Under the then-existing Texas capital-sentencing procedure, if the jury answered three questions in the affirmative, the judge was to impose the death sentence. See *id.,* at 457–458. One of these questions concerned the defendant's future dangerousness, an issue that the psychiatrist in effect addressed.

We concluded that there was a Fifth Amendment violation in the prosecutor's presentation of such testimony at the sentencing proceeding. After noting that the Fifth Amendment was applicable at a capital-sentencing hearing, we observed that the psychiatrist's prognosis of Smith's future dangerousness was not based simply on his observations of the defendant, but on detailed descriptions of Smith's *statements* about the underlying crime. *Id.,* at 464, and n. 9. Accordingly, in our view, Smith's communications to the psychiatrist during the examination had become testimonial in nature. Given the character of the psychiatrist's testimony, moreover, we were unable to consider his evaluation to be "a routine competency examination restricted to ensuring that respondent understood the charges against him and was capable of as-

sisting in his defense." *Id.*, at 465. We concluded: "When [at trial the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id.*, at 467. In such a situation, we found a Fifth Amendment violation because of the failure to administer to Smith, before the examination, the warning required by *Miranda* v. *Arizona*, 384 U. S. 436 (1966).

We recognized, however, the "distinct circumstances" of that case, 451 U. S., at 466—the trial judge had ordered, *sua sponte*, the psychiatric examination and Smith neither had asserted an insanity defense nor had offered psychiatric evidence at trial. We thus acknowledged that, in other situations, the State might have an interest in introducing psychiatric evidence to rebut petitioner's defense:

> "When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist." *Id.*, at 465.

We further noted: "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.*, at 468. This statement logically leads to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the

defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution. See *United States* v. *Byers*, 239 U. S. App. D. C. 1, 8–10, 740 F. 2d 1104, 1111–1113 (1984) (plurality opinion); *Pope* v. *United States*, 372 F. 2d 710, 720 (CA8 1967) (en banc), vacated and remanded on other grounds, 392 U. S. 651 (1968).

This case presents one of the situations that we distinguished from the facts in *Smith*. Here petitioner's counsel joined in a motion for Doctor Lange's examination pursuant to the Kentucky procedure for involuntary hospitalization. Moreover, petitioner's entire defense strategy was to establish the "mental status" defense of extreme emotional disturbance. Indeed, the *sole* witness for petitioner was Elam, who was asked by defense counsel to do little more than read to the jury the psychological reports and letter in the custody of Kentucky's Department of Human Services. In such circumstances, with petitioner not taking the stand, the Commonwealth could not respond to this defense unless it presented other psychological evidence. Accordingly, the Commonwealth asked Elam to read excerpts of Doctor Lange's report, in which the psychiatrist had set forth his general observations about the mental state of petitioner but had not described *any* statements by petitioner dealing with the crimes for which he was charged.[20] The introduction of such

---

[20] Petitioner argues that the jury may have been confused by the introduction of a report dealing with his competency to stand trial, a very different issue from his mental condition at the time of the crime that was the focus of his extreme-emotional-disturbance defense. Brief for Petitioner 43, and n. 68. Once more it is necessary to repeat that Doctor Lange's examination had as its purpose the determination whether petitioner should be committed for psychiatric treatment, not whether he was competent to stand trial. See n. 11, *supra*. Doctor Lange's observation that petitioner was competent to stand trial, see App. 73, was volunteered and, before Elam read Doctor Lange's report to the jury, the court eliminated all such references. *Id.*, at 58–59. Thus, what the jury heard from Doctor Lange's report was an evaluation of petitioner's mental condition. Although the doctor did note that petitioner reported thinking of "hurting"

a report for this limited rebuttal purpose does not constitute a Fifth Amendment violation.

## B

In *Estelle* v. *Smith*, we also concluded that Smith's Sixth Amendment right to the assistance of counsel had been violated. 451 U. S., at 469–471. As we observed, it was unclear whether Smith's counsel had even been informed about the psychiatric examination. *Id.*, at 471, n. 15. We determined that, in any event, defense counsel was not aware that the examination would include an inquiry into Smith's future dangerousness. *Id.*, at 471. Thus, in our view, Smith had not received the opportunity to discuss with his counsel the examination or its scope. *Ibid.* Here, in contrast, petitioner's counsel himself requested the psychiatric evaluation by Doctor Lange. It can be assumed—and there are no allegations to the contrary—that defense counsel consulted with petitioner about the nature of this examination.

Petitioner attempts to bring his case within the scope of *Smith* by arguing that, although he agreed to the examination, he had no idea, because counsel could not anticipate, that it might be used to undermine his "mental status" defense. Brief for Petitioner 48–49. Petitioner, however, misconceives the nature of the Sixth Amendment right at issue here by focusing on the use of Doctor Lange's report rather than on the proper concern of this Amendment, the consultation with counsel, which petitioner undoubtedly had. Such consultation, to be effective, must be based on counsel's being informed about the scope and nature of the proceeding. There is no question that petitioner's counsel had this information. To be sure, the effectiveness of the consultation

staff members at the facility, *id.*, at 72, such remarks only would have reinforced comments in earlier reports. See, *e. g.*, *id.*, at 45 ("Thus, under the proper circumstance, [petitioner] could be expected to be dangerous with respect to acts against other persons"). In sum, his report was similar in nature to the others read by Elam, except, of course, that Doctor Lange performed his evaluation at a later time.

also would depend on counsel's awareness of the possible uses to which petitioner's statements in the proceeding could be put. Given our decision in *Smith*, however, counsel was certainly on notice that if, as appears to be the case, he intended to put on a "mental status" defense for petitioner, he would have to anticipate the use of psychological evidence by the prosecution in rebuttal.[21] In these circumstances, then, there was no Sixth Amendment violation.

The judgment of the Supreme Court of Kentucky is affirmed.

*It is so ordered.*

---

[21] Petitioner contends that, if the use of a pretrial psychological evaluation is allowed, as in this case, defense counsel will be reluctant to request competency evaluations, even if they believe that their clients are in need of one, or they may "sandbag" the trial by raising the competency issue in a post-trial motion. Brief for Petitioner 42. Moreover, petitioner argues that the rule requiring competency examinations when the trial judge has doubts about a defendant's mental condition, see *Pate* v. *Robinson*, 383 U. S. 375 (1966), will be undermined by a decision in favor of the Commonwealth.

While we cannot foresee the tactics of defense counsel, we find somewhat curious petitioner's prediction and proposed solution. Where a competency examination is required under *Pate* and where the defendant does not place his mental state at issue, the Fifth and Sixth Amendments would mandate that he be allowed to consult with counsel and be informed of his right to remain silent. We observed in *Smith* that if, after receiving such advice and warnings, a defendant expresses his desire to refuse to answer any questions, the examination can still proceed "upon the condition that the results would be applied solely for that purpose." 451 U. S., at 468. Thus, where a defendant does not make an issue of his mental condition, we fail to see how the decision today will undermine *Pate*. Where, however, a defendant places his mental status at issue and thus relies upon reports of psychological examinations, he should expect that the results of such reports may be used by the prosecutor in rebuttal.

Finally, even if there were any conceivable constitutional error here, we would find it harmless in the circumstances of this case. As we noted above, see n. 8, *supra*, the defense of extreme emotional disturbance also requires a showing of provocation and cannot be established solely by evidence of mental illness. In petitioner's case, provocation was not demonstrated. Tr. of Oral Arg. 40; see also 691 S. W. 2d, at 212.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins and JUSTICE STEVENS joins as to Part I, dissenting.

I dissented from this Court's holding in *Lockhart* v. *Mc-Cree*, 476 U. S. 162 (1986), that "death-qualifying" a jury in a capital case before the guilt phase of the trial was constitutionally permissible. Today's extension of that holding to permit death qualification in a *joint* trial, where not all of the defendants face capital charges, compels me to dissent again. No interest of the Commonwealth of Kentucky justified the invasion of petitioner's Sixth Amendment rights when potential jurors were excluded on the basis of their answers to questions about an issue that was totally unrelated to the exclusively noncapital charges on which he was tried. If the Commonwealth chose to proceed with a joint trial, it was nonetheless required to observe petitioner's constitutional right to an impartial and representative jury.

I also dissent on the second issue in this case: whether admission of the information contained in the mental status report regarding petitioner's qualifications for involuntary hospitalization and treatment pending trial violated his Fifth and Sixth Amendment rights. This information was irrelevant to the issue on which it was admitted and, more importantly, was obtained for therapeutic purposes that can only be undermined by the Court's decision today. Petitioner legitimately expected that he would not, by requesting this limited mental examination, be generating evidence admissible against him at trial on issues unrelated to the charged offenses. His request for the examination was therefore uninformed and constituted no waiver of his Fifth and Sixth Amendment rights.

## I

As it did in *McCree, supra,* at 173, the Court today *assumes* that the accumulated scholarly studies demonstrate that death qualification produces juries abnormally prone to convict. *Ante,* at 415, n. 16. This assumption is well founded.

The evidence is "overwhelming" that death-qualified juries are "substantially more likely to convict or to convict on more serious charges than juries on which unalterable opponents of capital punishment are permitted to serve." 476 U. S., at 184 (MARSHALL, J., dissenting).

This Court nevertheless held in *McCree* that the interest of the State of Arkansas in having a single jury decide both guilt or innocence and the appropriate sentence was sufficient to reject a proposal made in *Witherspoon* v. *Illinois*, 391 U. S. 510, 520, n. 18 (1968), that separate juries decide these issues. The justifications for using a single jury were to avoid repetitive proceedings and to ensure that the capital defendant benefited at sentencing from any "residual doubt" regarding his guilt. See 476 U. S., at 181. However, Arkansas' asserted interest in efficient trial management was overvalued, and the "residual doubt" justification for the single jury untenable, unless the capital defendant's option to waive this purported benefit is recognized. *Id.*, at 205 (MARSHALL, J., dissenting). Today the Court again invokes the efficiency and "residual doubt" theories to justify use of a single jury in a capital trial. But it extends this reasoning to apply to a defendant who is tried jointly on exclusively noncapital charges.

As I observed in *McCree*, there are relatively few capital trials among state criminal prosecutions, and even fewer capital defendants are actually subjected to sentencing proceedings. The additional costs of implementing a system of separate juries, or of providing alternate jurors who would replace those who opposed the death penalty after the guilt determination had been made, are therefore minimal by comparison. Indeed, it appears that States would *save* time and resources by not death-qualifying jurors before the guilt phase of every capital case. *Id.*, at 204–205. In this case, the Commonwealth's asserted interest in efficiency is even more attenuated than it was in *McCree*. The Court cites the

"burden of presenting the same evidence to different juries," *ante*, at 418, but it can only *presume* the magnitude of this burden. The Commonwealth has in no manner substantiated its claim that providing separate juries or alternate jurors in joint trials involving noncapital defendants would create an·intolerable administrative burden.[1] It cites no other instance of having prosecuted a noncapital defendant alongside a capital defendant. The rarity of joint trials such as petitioner's belies any claim that the cost of empaneling an extra jury, or of providing alternate jurors, overrides his interest in being tried before a jury that is not uncommonly conviction prone. Moreover, under these proposals, the presentation of evidence need *not* have taken place more than once: one jury, not death qualified, could sit to decide guilt for both defendants and a sentence for the noncapital defendant, while simultaneously a death-qualified jury, or a number of death-qualified alternates, could hear the same evidence in preparation for a possible sentencing proceeding for the capital defendant.[2]

---

[1] Indeed, the fact that the Commonwealth requires bifurcated proceedings, with the possibility of empaneling separate juries "for good cause," Ky. Rev. Stat. § 532.080(1) (1985), to impose enhanced sentences on persistent felony offenders is strong evidence that its claim of administrative burden in the present case is exaggerated.

[2] To bolster its perception of the Commonwealth's administrative burden, the Court describes an "anomalous result" that it believes would inexorably obtain if petitioner's proposals were accepted, in cases in which a capital defendant is also charged with noncapital offenses, indicating that more than one trial would logically be required. *Ante*, at 419. I disagree. In the first place, no such claim by a capital defendant has been presented to this Court. If this claim were presented, however, I would, consistent with my dissent in *Lockhart* v. *McCree*, 476 U. S. 162, 203–206 (1986), hold that separate juries for the guilt and sentencing issues should be empaneled, or that alternate jurors should be provided so that death qualification could occur only after a decision had been reached on the defendant's guilt or innocence on *all* alleged offenses. Separate *trials* would not necessarily be required. But even if they were, the Commonwealth has altogether failed to demonstrate the incidence of the separate trials that might

Nor is the assertion that petitioner might have benefited from a joint trial before a death-qualified jury defensible. The application of this variant of the "residual doubt" theory is, at best, speculative. I can find no record support for the Court's suggestion that, by not moving to sever his case from that of the capital defendant, "petitioner made the tactical decision that he would fare better if he were tried by the same jury," *ante,* at 418, whether the issue were his responsibility relative to the noncapital defendant in the commission of the noncapital offenses, his culpability relative to that defendant for sentencing purposes, or the possibility of lingering doubts as to his guilt on the noncapital charges resulting in a more favorable sentence recommendation. More importantly, the Court's suggestion that the joint trial before a death-qualified jury was in petitioner's best interest is untenable, in light of its refusal to allow petitioner the option of waiving this perceived benefit. See *McCree, supra,* at 205 (MARSHALL, J., dissenting).[3]

The joint-trial aspect of this case permits the Court to venture an additional justification for a single jury not applicable in *McCree:* "promoting the reliability and consistency" of the judicial process. *Ante,* at 418. But petitioner's proposals for separate juries or alternate jurors in no way endanger these

occur. I cannot accept the Court's invocation of a perceived burden, totally unmeasured, in order to justify petitioner's trial before an uncommonly conviction-prone jury.

[3] The record, in fact, precludes any inference that petitioner somehow benefited from the assessment of this death-qualified jury regarding his guilt and sentence. The jury flatly ignored the prosecutor's specific explanation in closing argument that the Commonwealth was *not* asking for a finding of guilt under the instruction on intentional murder, the crime for which petitioner was convicted, but rather under a theory of conspiracy. Tr. 1336 (Aug. 2–13, 1982); App. 74–75. The sentence fixed by the jury for each offense—murder, robbery, rape, and sodomy—was the maximum the law allowed, and the jury took the unusual step of directing on its own initiative that the sentences be served consecutively. Tr. 1347–1348 (Aug. 2–13, 1982); App. 75.

interests. Regarding guilt or innocence as between capital and noncapital defendants tried jointly, a single nondeath-qualified jury would make reliable and consistent findings, findings that are not tainted by the proven conviction-prone character of a death-qualified jury. That same jury's recommended sentence for the noncapital defendant would, by its very nature, be fully informed. A separate death-qualified jury, or the original jury now death qualified with alternates replacing jurors who oppose the death penalty, would hear additional evidence and assess the appropriate sentence for the capital defendant. These jurors, having all observed the guilt phase of the trial as well, would be fully apprised of the acts underlying the offenses for which convictions were returned. There simply remains the matter of consistency as between the defendants regarding their respective sentences. The sentencing alternatives for the convicted capital defendant are life and death. These options equal or exceed in severity the possible sentences the noncapital defendant may receive. There is no danger that the noncapital defendant would be punished more severely than the capital defendant. Petitioner's suggested alternatives would, therefore, not produce unreliable or inconsistent assessments of guilt or of culpability for sentencing purposes.

Petitioner sought simply to have his guilt or innocence and possible sentences on exclusively noncapital charges determined by jurors as impartial as those that sit in all other noncapital cases. Death qualification unfairly tilts the scales of justice in favor of the prosecution, and was particularly unfair in this case because the qualification criteria were entirely unrelated to the issues to be decided with respect to this defendant. It is conceded, see Tr. Oral Arg. 34, and the Court's analysis today implicitly accepts, that the Sixth Amendment would have prohibited death qualification had petitioner been tried alone. Having chosen to proceed with a joint trial, it is incumbent on the Commonwealth to justify the resulting deprivation of petitioner's constitutional right

to have an impartial and representative jury decide his fate. No interest of the Commonwealth justifies death qualification before the guilt phase in a trial against a capital defendant, and *a fortiori* no interest justifies death qualification of a jury that is to decide issues affecting a noncapital defendant in a joint capital trial. Today's decision, like others before it, is the product of this Court's "unseemly eagerness to recognize the strength of the State's interest in efficient law enforcement and to make expedient sacrifices of the constitutional rights of the criminal defendant to such interests." *Wainwright* v. *Witt*, 469 U. S. 412, 462–463 (1985) (BRENNAN, J., dissenting).

## II

In his defense, petitioner relied on psychological reports prepared while he was in the custody of the Commonwealth's juvenile justice system before the commission of the crimes in this case. See *ante*, at 408–409, and n. 9. These reports tended to establish that he had suffered from emotional disturbance and had been in need of treatment. A lack of treatment would have supported a finding that petitioner had later acted, at the time of the crimes charged, "under the influence of extreme emotional disturbance." Ky. Rev. Stat. § 507.020(1)(a) (1985). Such a finding would have precluded petitioner's conviction of murder. To rebut this evidence of emotional disturbance, the Commonwealth introduced over objection the contents of a mental status report prepared at the request of both petitioner and the Commonwealth after petitioner had been arrested, and addressing issues wholly unrelated to his mental state at the time of the alleged offense.

In accordance with the parties' request, the examiner assessed whether petitioner met the criteria for involuntary hospitalization and treatment pending trial. The focus of the examiner during his "one hour" interview with petitioner was on the "here and now," and not on petitioner's mental condition when the killing occurred, seven months earlier. App.

72; see *ante*, at 412, n. 12. As such, the information in the report was irrelevant to the issue on which it was admitted. Yet the limited focus of the report is significant: it demonstrates the fundamental distinction between an examination for the purpose of assessing a defendant's then-present amenability to involuntary hospitalization and treatment pending trial, and an examination for the purpose of assessing the defendant's prior mental condition at the time of the alleged offense. The Court acknowledges this temporal difference, *ante*, at 423–424, n. 20, but misses its importance.[4]

The Kentucky statute governing involuntary hospitalization and treatment at the time of petitioner's examination was designed to assist the mentally ill person who currently "presents an immediate danger or an immediate threat of danger to self or others as a result of mental illness," who "can reasonably benefit from treatment," and for whom "hospitalization is the least restrictive alternative mode of treatment presently available." Ky. Rev. Stat. §202A.070(5) (1977). Clearly, the examination was not intended to generate evidence of a defendant's criminal responsibility, including his mental status at the time of an alleged offense. The examination takes its meaning instead from humanitarian and therapeutic concerns unrelated to the prosecution of criminal defendants, concerns that may be fully served only by the unimpeded establishment of relations of trust and cooperation among the physician, the Commonwealth, and the potential patient. These concerns apply with full force to the mentally ill criminal defendant, and in this context re-

---

[4] The Court emphasizes instead the different purposes of an examination for competency to stand trial and an examination for pretrial involuntary hospitalization and treatment. *Ante*, at 423–424, n. 20. Yet both types of examination focus on the defendant's *present* mental condition. Nor is it sufficient to observe that the reports relied upon by petitioner and the report relied upon by the Commonwealth were "similar in nature," only produced following evaluations "performed" at different times. *Ibid.* The relevant distinctions are the temporal focuses and underlying purposes of the examinations themselves.

quire the trust and cooperation of the defendant's attorney as well. If the purposes of the involuntary hospitalization and treatment provision are to be attained, and examinations are to be accurate and treatments effective, the defendant must feel free to request an examination without lingering fears that the content of his discussions with the examiner, or the examiner's impressions of his current mental status, will be used against him at trial.[5]

It is no doubt possible, though I believe unlikely, that the Commonwealth intended to offer petitioner the possibility of "involuntary" hospitalization and treatment pending trial only on the condition that he waive objections to the admission of inculpatory statements given or impressions made during his examination. However, because such a decision is totally at odds with the fulfillment of the statute's underlying purposes, it cannot be *assumed* that either petitioner or his attorney knew of this condition when joining a request for the examination. To the contrary, the fair assumption is that petitioner implicitly limited his consent to the examination with due regard for the purposes it was designed to serve. Our decision in *Estelle* v. *Smith*, 451 U. S. 454 (1981), contrary to the Court's reading of it today, *ante*, at 425, did not put petitioner and counsel on notice that statements made

---

[5] The Commonwealth is free, of course, to compel a *separate* examination specifically inquiring as to the mental condition of the defendant at the time of the alleged offense, once put on notice that the defendant will place this mental condition in issue. *Estelle* v. *Smith*, 451 U. S. 454, 465 (1981). Given notice, the Commonwealth bears full responsibility for being prepared at trial to rebut a mental status defense.

Though not essential to my view of the proper resolution of this case, there can be no argument that petitioner exploited protected examination procedures in order to manufacture evidence to support a mental status defense. The psychological reports upon which he relied at trial were prepared at the Commonwealth's insistence while petitioner was under the supervision of the juvenile justice system. Moreover, the examinations were conducted *before* the crimes in this case were committed, thus preventing any inference that the evidence of petitioner's emotional disturbance was a product of self-serving origin.

during this examination could be used by the Commonwealth to rebut petitioner's temporally and functionally unrelated evidence of emotional disturbance. *Estelle* v. *Smith* did not hold that the contents of *any* psychological report may be admitted as rebuttal evidence on an issue of the defendant's mental status. Petitioner's request for the examination was materially uninformed, as was his consultation with counsel. He was therefore denied his rights under the the Fifth and Sixth Amendments, which demand more sensitive consideration of the limited purposes of specific psychiatric examinations than the Court is willing to recognize today.[6]

I respectfully dissent.

---

[6] The right to be tried and convicted only if legally competent inheres in the Fourteenth Amendment, see *Pate* v. *Robinson*, 383 U. S. 375, 378 (1966), and thus implicates constitutional principles in addition to the Fifth and Sixth Amendment requirements of an informed request for a mental examination and informed consultation with counsel. As the Court correctly points out, though the purposes of a competency examination and an examination to assess amenability to involuntary hospitalization and treatment differ, *ante*, at 411, n. 11, and 423–424, n. 20, the examinations share an identical temporal focus and may be ordered against the wishes of a criminal defendant. Moreover, the integrity of the clinical endeavor envisioned by both examinations requires the creation and maintenance of relations among the prosecution, defense, examiner, and defendant that are as open and as cooperative as possible. Therefore, I also reject the Court's suggestion that, where a defendant places his mental status at the time of the alleged offense in issue by relying on reports of psychological examinations that do not address mental competency at the time of trial, he should expect that the results of his competency examination may be used by the prosecutor in rebuttal. *Ante*, at 425, n. 21.