**Jim VANDERBILT, Petitioner,**

v.

**James A. LYNAUGH, Director, Texas Department of Corrections, Respondent.**

**Civ. A. No. B–82–912–CA.**

United States District Court, E.D. Texas, Beaumont Division.

March 1, 1988.

B. Warren Goodson, Jr., and Stephen S. Walley, Beaumont, Tex., for petitioner.

Jim Vanderbilt, pro se.

Robert Walt, Asst. Atty. Gen., Austin, Tex., for respondent.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

In 1979 petitioner was convicted, and sentenced to die, for the April 1, 1975, capital murder of Katina Moyer. The circumstances of the crime are set forth in *Vanderbilt v. State*, 629 S.W.2d 709 (Tex. Cr.App.1981), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982), and will not be repeated here. Petitioner was indicted three times for the Moyer killing: the first indictment resulted in a 1976 conviction and death sentence, overturned on appeal; the second was dismissed by motion of the state; the third led to the conviction and sentence petitioner now challenges. Reversal of the 1976 conviction was based on the exclusion, at trial, of evidence through which Vanderbilt had sought to discredit the reliability of a confession. *Vanderbilt v. State*, 563 S.W.2d

590 (Tex.Cr.App.1978). Dismissal of the second indictment followed a pretrial ruling suppressing oral and written confessions made by petitioner as unconstitutionally obtained. Having exhausted appellate and state habeas remedies following his second trial (and third indictment), petitioner seeks a federal writ of habeas corpus. He alleges constitutional defects in both the guilt-innocence phase and the penalty phase of the 1979 proceedings.

In attacking his conviction, petitioner argues that the 1979 trial violated the Double Jeopardy Clause; that forensic evidence (a bullet and hair samples) relied on by the state were tainted fruits of his suppressed confessions; that hearsay evidence of a forensic expert's statements, which tended to tie petitioner to the victim's death, violated his right to confront his accusers and his right to due process; and that the state failed to prove the victim to have been kidnapped before her death, a statutory element of capital murder under the facts of the case. None of these claims are meritorious.

Petitioner further contends that his Fifth and Sixth Amendment rights were violated during the penalty phase of his trial when the state, in order to prove Vanderbilt's future dangerousness, introduced psychiatric testimony derived from a 1975 competency examination undertaken without any warning, to petitioner or his lawyer, of its possible use at the penalty phase of his

trial. After a review of the entire state court record, and an evidentiary hearing, the court concludes that petitioner is entitled to a writ setting aside his death sentence. The underlying conviction shall remain undisturbed.

### Fifth Amendment Claim

As required by Texas law, the same jury that found petitioner guilty of murder was asked to determine, following a separate sentencing hearing, whether the death penalty should be imposed. To obtain a death sentence in Texas, the state must prove beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim.Prac.Ann., Art. 37.071(b)(2) (Vernon 1981).[1]

Six witnesses appeared for the state at the sentencing hearing. The first five testified briefly to petitioner's reputation in the community. The sixth witness, Dr. Kenneth McTague, offered his professional opinion that petitioner would present a continuing threat to society if allowed to live. Dr. McTague—whose testimony was approximately four times the combined length of the other five state's witnesses'—had been the supervising psychologist at a mental health facility where petitioner was examined in 1975, before his first trial.

---

1. Texas Code Crim.Proc.Ann., Art. 37.071 (Vernon 1981), enacted in 1973 and therefore in effect during petitioner's trial, provides in pertinent part:

 "(a) Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court before the trial jury as soon as practicable. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

 "(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
 "(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
 "(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
 "(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.
 "(c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted.
 The question specified in (b)(3) was not submitted to the jury.

In 1975, petitioner had moved for an examination to determine his competence to stand trial and his sanity at the time of the offense. The original trial court granted the motion, and an examination was conducted over a two-day period. Although McTague's signature appears on the psychological report that resulted from this examination, the interviews were conducted by Dr. William Kracke, a psychiatrist who summarized the examination in a letter to the trial court, and Mr. Bradley Klein, a senior counselor at the facility. Kracke and Klein, along with petitioner and his 1975 attorney, Jim Brown, testified at an evidentiary hearing in this court.

At the evidentiary hearing, Kracke stated that he advised petitioner, before commencing the examination, that petitioner's participation was voluntary and that anything he said might be used against him in court. Klein testified that he told petitioner that he need not answer any questions, and that the report would be given to the court and to the state. Both Kracke and Klein understood the examination to be limited to issues of sanity and competence. Neither Kracke nor Klein warned petitioner that the examination might be used as evidence at the sentencing hearing; indeed, both testified that they were unaware that future dangerousness was an issue in capital sentencing cases.

Attorney Brown testified that he had not been informed, in 1975, that the examination would bear on the question of future dangerousness. He had been opposed to the idea of petitioner undergoing a competency and sanity examination, for three reasons: (1) he did not believe there was any chance of presenting an effective insanity defense; (2) he thought petitioner competent to stand trial; and (3) he feared petitioner might incriminate himself. Brown explained that his concern about self-incrimination was based on general defense principles—that volunteered statements were far more likely to hurt than to help petitioner's case. Brown recalled worrying about self-incrimination regarding guilt and innocence, but not the imposition of the death penalty or proof of future dangerousness. Petitioner testified that he received no warnings of any kind from Kracke or Klein, and no explanation from any source of a potential connection between the examination and a death sentence.

In *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court found a Fifth Amendment violation in the state's unwarned use, at the sentencing phase of a capital murder trial, of a pre-trial competency examination where the defendant

> was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death. He was not informed that, accordingly, he had a constitutional right not to answer the questions put to him.

451 U.S. 467, 101 S.Ct. 1875.

> Because respondent did not voluntarily consent to the pretrial examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to Dr. Grigson to establish his future dangerousness. If, upon being adequately warned, respondent had indicated that he would not answer Dr. Grigson's questions, the validly ordered competency examination nevertheless could have proceeded upon the condition that the results would be applied solely for that purpose. In such circumstances, the proper conduct and use of competency and sanity examinations are not frustrated, but the State must make its case on future dangerousness some other way.

*Id.* at 468–69, 101 S.Ct. at 1875–76.

 The perception behind this holding is that there can be no knowing and intelligent waiver of the right not to incriminate oneself, when "waiver" occurs without notice that one's statements may directly lead to a sentence of death. Thus, a defendants's request for a pre-trial examination on competence and sanity does not, by itself, waive his Fifth Amendment privilege against incriminating himself at the penalty phase of his trial. *E.g., Battie v. Estelle*, 655 F.2d 692 (5th Cir.1981). And

warnings which fail to specify that statements made at a pre-trial examination may be used against the defendant at the sentencing hearing "constitute[] a violation of [the defendant's] Fifth Amendment rights." *Ex parte Demouchette*, 633 S.W. 2d 879, 881 (Tex.Cr.App.1982).

■ Respondent argues that the warnings assertedly given to petitioner by Kracke and Klein distinguish this case from *Estelle v. Smith* and its progeny—that Vanderbilt received the substantial equivalent of *Miranda* warnings, and that his participation after putatively being "Mirandized" reflects a valid waiver of his Fifth Amendment rights. Petitioner denies receiving any warnings from the examiners. But even if Kracke and Klein generally warned petitioner that his statements could be used against him, and that he was free not to participate, petitioner did not receive the information he would have needed to receive in order to make a valid waiver of his Fifth Amendment right, elucidated by *Estelle v. Smith*, not to testify against himself at the penalty phase of a capital trial.

Chief Justice Burger characterized the Fifth Amendment issue in *Estelle v. Smith* as follows: "whether the admission of Dr. Grigson's testimony at the penalty phase violated respondent's Fifth Amendment privilege against compelled self-incrimination because respondent was not advised before the pretrial psychiatric examination that he had a right to remain silent and that any statement he made could be used against him *at a sentencing hearing.*" 451 U.S. at 461, 101 S.Ct. at 1872 (emphasis added). "Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent *and the possible use of his statements,*" the Court concluded, "the State could not rely on what he said to Dr. Grigson to establish his future dangerousness." *Id.* at 468, 101 S.Ct. at 1876 (emphasis added).

By "the possible use of his statements," the Court clearly had in mind their possible use at a sentencing hearing. Accordingly, the warning on possible use must expressly

address their use at the penalty phase, before a defendant can be said to have made a valid waiver of the Fifth Amendment privilege. *See, e.g., Battie,* 655 F.2d at 697 (*Estelle v. Smith* requires "a prior warning to the defendant that he has a right to remain silent and that any statement he made could be used at a sentencing proceeding"); *Spivey v. Zant,* 661 F.2d 464, 474–75 (5th Cir.1981), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982) (same); *Muniz v. Procunier,* 760 F.2d 588, 589 (5th Cir.), *cert. denied,* 474 U.S. 934, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985) ("No *Miranda* warning was given Muniz, nor was he told that the responses to the doctor's questions might be used against him on issues governing his punishment.... There is no question that, under *Estelle v. Smith,* there were Fifth and Sixth Amendment violations"). Only one death penalty opinion known to this court, never cited for the proposition, has held to be adequate a warning on the possible use of a pre-trial examination that did *not* specify its eventual use at a sentencing hearing. *See Harris v. Pulley,* 692 F.2d 1189 (9th Cir.1982), *rev'd on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Indeed, the Texas Court of Criminal Appeals—which decided the direct appeal of this case without a record on the warnings, if any, that were administered—apparently sides with petitioner on this question. *See Demouchette,* 633 S.W.2d at 880–81 ("While ... Dr. Brown did advise petitioner that he did not have to answer any question, petitioner was not advised that his answers could be produced against him at the punishment stage. Under the holding in *Estelle v. Smith* ... this constituted a violation of petitioner's Fifth Amendment rights"); *cf. Ex parte English,* 642 S.W.2d 482, 482 (Tex.Cr.App.1982) (granting habeas corpus relief where "the applicant was not informed that he had a right to remain silent, that his statements and the psychiatric testimony based on the examination could be used at the punishment stage of his trial").

■ An adequate pre-examination warning must specifically address the sentenc-

ing hearing, and the centrality of future dangerousness to its outcome. For this reason, a standard *Miranda* warning that statements may be used against the defendant in court is inadequate to apprise the defendant even generally of what is at stake. In such circumstances, there can be no "intentional relinquishment of a known right or privilege," *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), because without basic information about the possible use of his statements at the sentencing hearing the defendant lacks "sufficient awareness of the relevant circumstances and likely consequences," *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970), of relinquishing his right to remain silent.

The state further contends that McTague's testimony "[did] not rely on the psychiatric evaluation," Resp. Post–Hearing Brief at 10, because McTague made certain statements in response to a question that asked him to predict the potential for violence of hypothetical individual who had committed the acts attributed to petitioner. As respondent previously has conceded, however, McTague's testimony exceeded the bounds of hypothesis: it "was based," in part, "upon an evaluation of 1975 test results which were obtained by some third person." Resp. Amended Answer and More Definite Statement at 6. This emerges very clearly from the record of his testimony, excerpted here at greater length than in the opinion of the Court of Criminal Appeals:

Q. (by District Attorney): And directing your attention to September of 1975, were such tests [as the Wechsler Adult Intelligence Scale, Rorschach, Minnesota Multiphasic Personality Inventory, and Wechsler Memory Scale tests] administered to Jim Vanderbilt?

A. (by Dr. McTague): Yes, they were.

Q. And did you examine those test results and make an evaluation based thereon?

A. Yes, I did.

Q. Was that evaluation done at the request of the Court?

A. Yes, it was, specifically through Dr. Bill Crackey [sic].

\* \* \* \* \* \*

Q. Now Doctor, based upon your evaluation, do you have an opinion as to whether or not Jim Vanderbilt is a violent person?

A. My opinion is that often he is extremely well-controlled, extremely guarded, extremely deliberate in his actions. However, my belief is that when he is affected by emotionality that he likely is to be very impulsive in his behavior.

Q. You say generally he is well-controlled?

A. Right.

Q. But if he loses that control what is the result?

A. He is likely to be extremely impulsive and to act without thinking or without being aware of the consequences of his behavior.

Q. Based upon your evaluation, Doctor, do you have an opinion as to whether or not Jim Vanderbilt experiences guilt feelings?

A. I believe that he felt very depressed when we evaluated him. I think he felt bad relative to the reality of having been apprehended and having the charges against him and being incarcerated. As far as guilt being determined by conscience and a feeling of wrongness associated with the act, my belief is that he did not experience that.

\* \* \* \* \* \*

Q. Did you detect any indication of guilt related to what he had done, feeling sorry for others?

A. No.

Q. Based upon your evaluation, Doctor, do you have an opinion or did you form an opinion as to Jim Vanderbilt's ability to learn from prior experience?

A. Yes. In the main he is the sort of person who does not learn very much from past experience. He tends to be rigid in dealing with life and is unlikely

to benefit much from previous experiences.

Q. Is he likely to benefit from punishment of any kind?

A. Probably not unless it was extreme.

Q. Doctor, based upon your evaluation, do you have an opinion as to whether or not Jim Vanderbilt has some sexual difficulty?

A. Yes, I do. I believe that he has a general identity problem in the area of sexuality. And by that I mean having some concern, lack of clarity about his masculinity.

Q. Doctor, based upon your evaluation, do you have an opinion as to whether or not Mr. Vanderbilt would be likely to commit other acts of violence?

A. Predicting violence is very difficult to do. Based on my test data I can only give a gross guess.

Q. Doctor, assume that the evidence shows that on March 27, 1975, Jim Vanderbilt approached a young woman with a gun, that he handcuffed her, that he took her and her car to an area where there was no one around, that he, while she was still handcuffed, unbuttoned her blouse, loosened her brassiere, fondled her breasts, kissed her breasts, undid her pants and attempted to put his hand in that area, that this young girl persuaded him not to continue with that conduct, and that ultimately he released that girl, that five days later on April 1, 1975, Jim Vanderbilt kidnapped and shot and killed another young girl, now taking those things into consideration, do you have an opinion as to whether or not he would be likely to commit future acts of violence?

A. Yes, I do. The research indicates that the best predictor of future behavior is past behavior. If someone has done actions like you describe several times, then it is increasing the likelihood they may do it again as opposed to not.

■ The Court of Criminal Appeals, stressing the extended factual hypothetical and McTague's comment that he could give only "a gross guess" in predicting violence, found that his testimony at the sentencing hearing was not based on petitioner's statements at the pre-trial examination. The foregoing excerpt reveals that before making his general remark on the vagaries of behavioral prediction, McTague had depicted petitioner—on the stated basis of his own evaluation—as a remorseless, extremely impulsive, virtually unreformable man likely to react recklessly and uncontrollably to emotional stress. Not surprisingly, McTague's testimony in this regard echoed the clinical judgments set forth in the report submitted to the trial court in 1975. *See* Exh. 1 to Petition for Writ of Habeas Corpus.[2]

"A hypothetical is not a hypothetical just because it is initiated by the word 'assume' or 'if.'" *White v. Estelle,* 554 F.Supp. 851, 856 (S.D.Tex.1982), *aff'd,* 720 F.2d 415 (5th Cir.1983) (psychiatrist's testimony at capital sentencing hearing not insulated from pre-trial examination by hypothetical form of question, where hypothetical named defendant, whom jury knew had been evaluated by doctor, and recited details of crime). Before any "hypothetical" question was posed to McTague, the jury knew that McTague had evaluated petitioner and had found him, essentially, to be an incurable sociopath.

Respondent cites *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), in an attempt to portray McTague's testimony as something wholly independent of the pre-trial examination. *Barefoot* merely approves the posing of hypothetical

---

**2.** McTague's repeated, direct, and damaging references to petitioner and to the 1975 examination impel the conclusion that the Court of Criminal Appeals' finding that McTague's testimony was unrelated to the examination—a conclusion which led that court to hold inapplicable *Estelle v. Smith* —"is not fairly supported by the record," 28 U.S.C. § 2254(d)(8), and therefore is not entitled, under the statute, to a presumption of correctness. Even if the presumption were applicable, thus raising the evidentiary burden on petitioner from preponderance of the evidence to "convincing evidence," 28 U.S.C. 2254(d), this court would find in favor of petitioner on question of McTague's reliance on the 1975 examination.

questions on future dangerousness to a psychiatrist who had never evaluated or examined the defendants; the legal issue addressed by the Court was whether testimony from a psychiatrist who had no contact with the defendant was competent evidence, not whether superficially hypothetical inquiries to an examining clinician can purge any Fifth or Sixth Amendment problems raised by his testimony. Unlike the doctor in *Barefoot,* McTague evaluated the defendant (and told the jury so). Even were the "hypothetical" question somehow a genuine supposition, it is adrift in testimony directly drawn from petitioner's 1975 examination.

■ The state contends that any error in the admission of McTague's testimony was harmless. But the length, depth, and forcefulness of McTague's testimony far exceeded that of the state's other penalty phase witnesses—all five of whom testified very briefly as to petitioner's general reputation. Especially given McTague's importance to the state's case, the court "cannot conclude that evidence admitted on a critical issue in the sentencing phase of a capital case, in violation of [petitioner's] constitutional rights, constituted harmless error beyond a reasonable doubt." *White v. Estelle,* 720 F.2d 415, 418 (5th Cir.1983).[3]

■ At the evidentiary hearing, attorney Brown testified that he described the Texas bifurcated trial system to petitioner, at some point before the 1975 examination. Respondent, arguing that petitioner therefore had "actual knowledge" of the states' eventual need to prove future dangerousness, urges the court to find a valid waiver of petitioner's Fifth Amendment privilege. Respondent also argues that the court order authorizing the examination, which provided that its results be made available to

the prosecution, gave notice to petitioner of the possible, eventual use of the examination. The 1974 examination took place within one year of the enactment of Texas's capital sentencing statute, and seven years before the Supreme Court's decision in *Estelle v. Smith;* apparently no one, including the examining clinicians and quite possibly the prosecution, foresaw the examination's use in 1981. *Cf. Buchanan v. Kentucky,* —— U.S. ——, 107 S.Ct. 2906, 2919, 97 L.Ed.2d 336 (1987). There is absolutely no indication in the record that *anyone,* let alone petitioner and his lawyer, anticipated or even speculated that the 1974 examination would yield evidence at a sentencing hearing. Petitioner briefly hoped to mount a defense of insanity, but abandoned this idea before the first trial— at which the state did not attempt to use the examination on any issue. Inferring a knowing waiver under this set of circumstances would be highly dubious, even were it not "settled law that an inferred waiver of a constitutional right is disfavored." *Brewer v. Williams,* 430 U.S. 387, 412, 97 S.Ct. 1232, 1246, 51 L.Ed.2d 424 (1977) (Powell, J., concurring). *Cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 238 n. 25, 93 S.Ct. 2041, 2053 n. 25, 36 L.Ed.2d 854 (1973) ("[T]he question whether a person has acted 'voluntarily' is quite distinct from the question whether he has 'waived' a trial right. The former question ... can be answered only be examining all the relevant circumstances to determine if he has been coerced. The latter question turns on the extent of his knowledge").

■ Finally, petitioner raised no psychological defense at trial, and introduced no psychological evidence at the sentencing hearing. Either course would have operated to waive petitioner's Fifth Amendment

---

**3.** The state cites *Satterwhite v. State,* 726 S.W.2d 81 (Tex.Cr.App.1986), *cert. granted sub nom Satterwhite v. Texas,* —— U.S. ——, 107 S.Ct. 2480, 96 L.Ed.2d 372 (1987), in support of its harmless error claim. In oral argument before the Supreme Court, a Texas Assistant Attorney General argued, in the words of a published summary, that "the psychiatrist's testimony [in *Satterwhite*] was only a small part of a five and one-half hour punishment phase of trial. That phase included much other evidence of the de-

fendant's prior convictions, violent acts, and weapons use, as well as other very damaging testimony." 42 Crim.L.Rep. 4102 (Dec. 23, 1987); *see also Satterwhite,* 726 S.W.2d at 93. McTague's role clearly was far more central. Moreover, the Court of Criminal Appeals did not discuss the relative importance of McTague's testimony in the sentencing hearing; its harmless error holding rested on other considerations altogether. *See* p. 1125, *supra.*

right to prevent McTague from testimony on the basis of the pre-trial examination. *E.g., Vardas v. Estelle*, 715 F.2d 206 (5th Cir.1983), *cert. denied*, 465 U.S. 1104, 104 S.Ct. 1603, 80 L.Ed.2d 133 (1984); *Riles v. McCotter*, 799 F.2d 947 (5th Cir.1986); *Williams v. Lynaugh*, 809 F.2d 1063 (5th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 1635, 95 L.Ed.2d 207 (1987). A defendant's request for an examination never used at trial does not invite its use in rebuttal by the prosecution. This is so despite the Supreme Court's statement, in *Buchanan*, that "if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." 107 S.Ct. at 2917–18. As the Court of Appeals for the Fifth Circuit recently explained, "[a]lthough the Court's use of the disjunctive [in *Buchanan* ] might even suggest that the defendant's request is sufficient by itself to constitute forfeiture of the privilege, the rest of the sentence and the opinion as a whole strongly imply that the defendant must have gone further and actually introduced psychological evidence." *Schneider v. Lynaugh*, 835 F.2d 570, 577 (5th Cir.1988).

### Sixth Amendment Claim

■ The Sixth Amendment violation in *Estelle v. Smith* was committed when "[defense] counsel ... were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness, and respondent was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." 451 U.S. at 470–71, 101 S.Ct. at 1876–77 (footnote omitted). It is undisputed that attorney Brown, like the lawyers in *Smith*, was not notified in advance that the examination would encompass the issue of future dangerousness. Petitioner did discuss the psychiatric examination with his attorney, who advised him not to undergo it. Respondent maintains that this exchange between lawyer and client satisfied the Sixth Amendment.

"[T]he decision to be made regarding the proposed psychiatric evaluation is 'literally a life or death matter' and is 'difficult ... even for an attorney' because it requires 'a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, [and] of possible alternative strategies at the sentencing hearing." *Estelle v. Smith*, 451 U.S. at 471, 101 S.Ct. at 1877 (quoting *Smith v. Estelle*, 602 F.2d 694, 708 (5th Cir.1979)). "For a lay defendant, who is likely to have no idea of the vagaries of expert testimony and its possible role in a capital trial, and who may well find it difficult to understand, even if he is told, whether a psychiatrist is examining his competence, his sanity, his long-term dangerousness for purposes of sentencing, his short-term dangerousness for purposes of civil commitment, his mental health for purposes of treatment or some of other thing, it is a hopelessly difficult decision. There is no reason to force the defendant to make it without 'the guiding hand of counsel.'" *Smith v. Estelle*, 602 F.2d 694, 708–09 (5th Cir.1979), *aff'd* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (quoting *Powell v. Alabama*, 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158 (1932)).

Respondent points out that Brown knew *some* examination was imminent, while the lawyers in *Smith* may have had no notice, *see* 451 U.S. at 458–59 n. 5 and 471 n. 15, 101 S.Ct. at 1870–71 n. 5 and 1877 n. 15. This factual difference is irrelevant: Brown was not able to advise his client regarding the examinations' ramifications on sentencing because he did not know, and had no reason to suspect, that the examination would be used to undergird his client's death sentence. Believing, as he did, that the examination was limited to matters of competence and sanity, Brown could not give petitioner the forceful, sentence-specific advice he surely required in the situation. The "guiding hand of counsel" was absent in this respect, not because of any failure on Brown's part but by reason of lack of notice of the examination's scope.

Consultation with a lawyer deprived of the crucial facts does not satisfy the Sixth Amendment. "Such consultation, to be ef-

fective, must be based on counsel's being informed about the scope and nature of the proceedings." *Buchanan*, 107 S.Ct. at 2919. "[T]he effectiveness of the consultation also would depend on counsel's awareness of the possible uses to which petitioner's statements in the proceeding could be put." *Id.* Petitioner's Sixth Amendment right to the assistance of counsel was violated, by the state, when Brown did not receive notice of the examination's true scope.

*Double Jeopardy*

■ Petitioner claims there was insufficient evidence, at his first trial, either to prove an intentional shooting or to prove special issues during the penalty phase. He maintains that the state is bound by the results of the first trial with regard to these matters. However, "[u]nless a prior conviction is reversed for lack of sufficient evidence, the reversal does not bar retrial." *Vardas*, 715 F.2d at 209; *Fransaw v. Lynaugh*, 810 F.2d 518 (5th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 3237, 97 L.Ed.2d 742 (1987). Because petitioner's first conviction was overturned on grounds other than insufficient evidence, retrial was permissible.

■ Petitioner also argues that dismissal of the second indictment barred his trial on a third. The record indicates that the district attorney moved for dismissal on grounds of insufficient evidence, following suppression of petitioner's oral and written confessions. It does not indicate that a jury had been empaneled, or that the judge made any substantive finding regarding the sufficiency of evidence. Because there was no "acquittal" for double jeopardy purposes, *see Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), dismissal of the second indictment did not bar subsequent prosecution. *Cf. Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986).

*Admission of Bullet and Hair Sample*

■ Petitioner contends that a bullet and hair sample, introduced into evidence at his trial, were fruits of his suppressed confession and therefore should have been excluded by the trial court. The Court of Criminal Appeals rejected this argument, on the ground that discovery of the evidence was inevitable. Under 28 U.S.C. § 2254(d), this factual determination is presumptively correct unless petitioner demonstrates the applicability of one or more exceptions to the presumption that are enumerated by the statute. *See generally Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982); *Bell v. Lynbaugh*, 663 F.Supp. 405, 411–12 (E.D.Tex. 1987).

The Court of Criminal Appeals made the following factual determinations concerning the bullet's recovery:

Officer A.L. Morris, of the Amarillo Police Department, testified that he and fellow officers searched for the bullet on April 17. The search lasted approximately four hours and was unsuccessful. An area in the shape of a semi-circle with a radius three hundred feet from the body was then staked off and systematically searched with the aid of metal detectors. The bullet was recovered within the staked-off area after a three-hour search on April 18.

The bullet was found by Officer James Smith of the Amarillo Police Department. Smith related that while sitting on the ground within the staked-off area, he observed the bullet lying on top of the ground. The bullet was two hundred and forty-eight feet from the victim's body in a northwesterly direction. Smith testified that he and fellow officers had conducted an experiment based upon statements made by appellant in an oral confession. The experiment was conducted in an effort to determine the location of the bullet at the scene of the offense. Independent of appellant's statement, Smith knew the location of the victim's body, the direction the victim's head was pointed at the time the body was found, the location of the entry and exit gunshot wounds to the victim's head, the victim's height and appellant's height. Further, it was shown that Smith knew the gunshot wound had dislodged an earring from the victim's ear

and that he was aware of the direction from the victim in which the earring was found.

With regard to the assistance appellant's statement furnished in locating the bullet and conducting the experiment, Smith testified:

"Q. Have you not or is it not true that in your in your mind, based upon the information that Boydston gave you [concerning appellant's oral confession] the bullet was found three to four feet from where it should have been?

"A. Well, you are talking about three to four feet in distance or—

"Q. No.

"A. —a path?

"Q. In an area.

"A. Yes.

"Q. Have you not—isn't it a fact also your opinion that you would not have had to have staked the area out nor used the metal detectors after your demonstration, you could have walked out in that area and found the bullet?

"A. As it turned out, yes.

"Q. In fact, is it not your opinion that if you had walked a straight line after that demonstration you would have found the bullet in 30 minutes?

"A. Probably would have."

\*　　\*　　\*　　\*　　\*　　\*

In the instant case, the record reveals that independent of appellant's statement, officers had a great deal of information concerning the location of the victim at the time she was shot. The bullet was ultimately discovered while Smith sat on the ground smoking a cigarette. Six to eight officers searched the semicircle with a three hundred foot radius for seven hours before the bullet was found. Finally, it was Smith's opinion that had he relied solely upon appellant's statement, the bullet could have been found in thirty minutes without the aid of metal detectors or the necessity of staking off the area. We conclude that the record supports the court's finding that the bullet would have been recovered regardless of the information fur-

nished by appellant's oral confession. No error is shown in the admission of the bullet into evidence.

*Vanderbilt,* 629 S.W.2d at 721–22, 723.

Competing inferences might be drawn from the trial court record. That the bullet was found approximately four feet from the location calculated by policemen relying on petitioner's suppressed statements suggests that those statements were important to its recovery, if not indispensable. On the other hand, photographs of the murder landscape show flat terrain, almost devoid of plants or other concealing obstructions. This fact, along with those enumerated by the state court, suggests that the bullet might well have been discovered, eventually, had the suppressed statements not been used.

The "inevitable discovery" exception to the exclusionary rule applies when it is "establish[ed] by a preponderance of the evidence that the information ultimately or inevitably would have been received." *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). For § 2254 purposes, inevitable discovery is "a question of fact, pure and simple." *Wicker v. McCotter,* 798 F.2d 155, 158 (5th Cir. 1986). The Court of Criminal Appeals' findings on this issue were not themselves inevitable, but they are fairly supported by the record. Because no statutory exception to their presumptive correctness is applicable, petitioner's burden in this court was to disprove them by "convincing evidence." 28 U.S.C. § 2254(d). He has not done so, and therefore is not entitled to relief on this claim.

*Remaining Claims*

 Petitioner contends that the testimony of Ronald Richardson, who stated at trial that the bullet which killed the victim was fired from a type of gun known to be possessed by petitioner, was based on another expert's work and therefore was inadmissible hearsay. "A state defendant has no constitutional right to an error-free trial. A federal habeas court may consider the propriety of state court evidentiary rulings only if there has been a constitutional

**1130**

infraction that renders the entire trial fundamentally unfair." *Banks v. McGougan,* 717 F.2d 186, 190 (1983). Even assuming this evidence to have been erroneously admitted, nothing in the state court record, or in petitioner's habeas representations, suggests that petitioner's trial was rendered fundamentally unfair by Richardson's testimony.

 Finally, petitioner asserts that the state failed to prove kidnapping, the relevant predicate offense to capital murder. The trial record amply demonstrates that the victim was kidnapped before she was killed. The evidence is circumstantial, as petitioner emphasizes, but far from weak. His claims in this regard are meritless.

*Conclusion*

A writ of habeas corpus, vacating petitioner's sentence of death, shall issue contemporaneously with this order; and the stay of execution previously granted in this proceeding shall be dissolved. The petitioner's application for the writ shall be denied in all other respects.