Gayland BRADFORD, Appellant,

v.

The STATE of Texas, Appellee.

No. 71048.

Court of Criminal Appeals of Texas, En Banc.

June 9, 1993.

Rehearing Denied Jan. 26, 1994.

E. Brice Cunningham, on appeal only, Dallas, for appellant.

John Vance, Dist. Atty., and Robert P. Abbott, Dan Hagood, Jerri Sims & Mike Uhl, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

OVERSTREET, Judge.

In January of 1990, appellant was convicted, in the 265th Judicial District Court of Dallas County, of capital murder pursuant to

V.T.C.A. Penal Code § 19.03(a)(2), specifically murder during the course of committing and attempting to commit robbery. The indictment alleged that the offense occurred on or about the 29th day of December 1988. After the jury returned affirmative answers to the special issues submitted pursuant to Article 37.071(b)(1), (2), V.A.C.C.P., the trial court assessed punishment at death. On direct appeal, appellant raises one hundred four points of error.

## I.

### SUMMARY OF PERTINENT FACTS

The record reflects that the instant offense involved the late-night armed robbery of a grocery/convenience store. During the robbery, a store security guard was shot to death. Appellant, in a written confession, admitted shooting the guard. A store videotape recorded the shooting and confirmed appellant's confession.

## II.

### EXPERT TESTIMONY AT PUNISHMENT

Points eleven, twelve, thirteen and fourteen all involve the trial court's refusal to allow certain expert psychiatric testimony proffered by a defense witness at punishment unless appellant agreed to be examined by an expert psychiatric witness of the State's choosing. It is undisputed that none of the psychiatric/psychological examinations in the instant cause were for the purpose of determining competency or sanity issues. During appellant's presentation of evidence at punishment, the State expressed concerns about not having the opportunity to have an expert psychiatrist of its choosing examine appellant. The State asked that appellant's psychiatric expert not be allowed to testify because the State had been denied access to examine appellant. The State requested that Dr. Rennebohm and/or Dr. Grigson be allowed to examine appellant.

Appellant's witness, Dr. Wettstein, was questioned outside the presence of the jury.[1] After questioning about his anticipated testimony, the State asked that Dr. Grigson, Dr. Rennebohm, a Dr. Turner, or a Dr. Coones be allowed to examine appellant; and that if appellant refused to submit to such, that Dr. Wettstein's testimony be disallowed. Appellant's attorneys strenuously objected to being forced to make such a choice.

Appellant's attorneys, in expressing an understanding that the trial court was going to order appellant to undergo psychiatric examination by some other psychiatrist, indicated that appellant was not knowingly and voluntarily waiving his Fifth Amendment right regarding incrimination.

The trial court ordered appellant to submit to an examination by the State's psychiatrist. Appellant's attorneys advised appellant to refuse to participate and exercise his Fifth Amendment right to remain silent. Appellant himself indicated that he was going to follow his attorneys' advice and not talk to the doctor. Appellant said, "I do not want to talk to him[,]" and responded negatively when again asked. The State then asked "that the testimony of Dr. Wettstein be disallowed, he not be allowed to testify[.]"

The trial court ruled that it would restrict the testimony of Dr. Wettstein and only allow testimony by Dr. Wettstein that did not include, as a basis for his opinion, the examination of appellant. The trial court stated, "[a]nything that he used in the examination of [appellant] in making his conclusions or opinions w[ould] not be allowed. . . . The results of an examination by a [d]efense psychiatrist and the statements given by the [d]efendant to that psychiatrist will not be admitted." The trial court indicated that this would preclude Dr. Wettstein from giving an opinion about appellant's diagnosis and his intellect or whether he was a sociopath as such opinion would clearly come from the examination. Later, as clarification, the trial court reiterated, "I'm just telling you, anything that Dr. Wettstein would testify to that

---

1. The proffered testimony of Dr. Wettstein focused on three areas:
 1. Future dangerousness in the long term cannot be accurately predicted;

2. Appellant was diagnosed as borderline intellectual functioning;
3. Appellant was not diagnosed as having an antisocial personality disorder.

would be based upon his personal examination of the [d]efendant would not be allowed." During discussions about the law involved in this matter of a defendant refusing to be examined, the trial court commented that "[n]one of the cases list what the sanction should be."

During the course of this discussion, appellant's attorneys again objected and insisted that imposing such a sanction denied appellant effective assistance of counsel and due process. There was then some discussion about the State not having previously filed a written motion for psychiatric examination; thus, further objection was made that the State's request was untimely and not in compliance with Articles 46.02 § 3(d) and 46.03 § 3(d), V.A.C.C.P. When the trial court mentioned getting Dr. Wettstein on to make a bill of exception, one of appellant's attorneys noted that he had seen Dr. Grigson outside, and that since the trial court's "ruling obviously cuts very deep[ly] into the defense ... by disallowing pertinent evidence to be submitted to the jury," appellant would submit to the examination by Dr. Grigson with the proviso that Dr. Wettstein be allowed to be present and observe Grigson's examination. Though the State expressed displeasure at the prospect of Wettstein being allowed to be present during Grigson's examination, the prosecutor relented and agreed. Appellant himself, after consultation with his attorneys, also agreed to submit to an examination by Dr. Grigson with Dr. Wettstein present.

Appellant's attorneys stated that it was only because of the trial court's prior ruling that they were agreeing to submit to the Grigson examination. They explicitly did not waive any previous objections.

Thus, appellant agreed to submit to an examination by Dr. Grigson with Dr. Wettstein present and observing. In light of such, the trial court allowed appellant to present testimony by Dr. Wettstein which included opinions based upon his independent examination of appellant. After Wettstein's testimony, appellant, in anticipation of Dr. Grigson's examination, again objected to such "being done at the instance of the [trial court]—[that] the testimony of Dr. Wettstein

was conditional, that the only way Dr. Wettstein could testify as to his diagnosis of [appellant] would be to allow the State the opportunity to examine [him]." Appellant made it clear that he submitted to the examination because he felt bound by the trial court's ruling to which he objected. Appellant made it clear that he did not waive any Fifth Amendment rights.

In rebuttal, the State presented testimony from Dr. Grigson, who had conducted an examination of appellant. After Grigson's direct examination testimony and outside the presence of the jury and prior to cross examination, appellant stated for the record that prior to the testimony of Dr. Grigson, he had addressed the trial court and renewed his objection that had been made numerous times, which the trial court was well aware of, and that the trial court had allowed the objection to be made at that time to be considered timely as if made prior to the time Grigson testified. The trial court responded, "Any objection made at this time is timely and your rendering of what happened is correct."

### III.

### APPELLANT'S CLAIM

Point number eleven claims error and abuse of discretion in requiring that appellant be examined by Dr. Grigson to enable Dr. Wettstein's testimony to be admitted into evidence, because such was a violation of *Estelle v. Smith* and the Fifth and Sixth Amendments of the United States Constitution. Point twelve likewise claims error in imposing sanctions on appellant, i.e. by not allowing Dr. Wettstein's testimony about his examination, when such sanctions are not set out in the Rules of Criminal Procedure, Rules of Evidence, or applicable caselaw, because such denied him effective assistance of counsel and due process of law guaranteed by the Fourteenth Amendment to the United States Constitution and the Texas Constitution. Point number thirteen alleges error in requiring the Grigson examination in violation of the Fifth and Sixth Amendments of the United States Constitution. Point of error fourteen avers error and abuse of discre-

tion in ordering that Dr. Grigson be allowed to examine appellant, over objection, solely to determine future dangerousness. Obviously all of these points of error concern the trial court's decision with respect to making the admissibility of portions of Dr. Wettstein's proffered testimony contingent upon appellant submitting to an examination by a State-selected expert.

The State disputes whether the trial court ever "appointed" Dr. Grigson to do anything, in that it had already named him on its witness list, and that appellant dispensed with the need for an appointment order when he acquiesced to the examination. However, the trial court explicitly stated that it was going to order an examination at the earliest convenience. We find that the trial court did effectively order that appellant submit to an examination by one of the State's proposed experts. The fact that appellant submitted to such does not make it any less of an order from the trial court. Clearly Dr. Grigson conducted his examination of appellant, and appellant submitted thereto, pursuant to an order from the trial court.

The State also claims that "[b]y introducing evidence of two psychiatric evaluations, then, [a]ppellant clearly waived his Fifth Amendment rights in the instant case." It cites language in several United States Supreme Court cases in support of that proposition, specifically *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); and *Powell v. Texas*, 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989).

*Estelle v. Smith* involved a defendant's Fifth and Sixth Amendment rights under the United States Constitution being abridged by the State's introduction of psychiatric testimony at punishment because of the failure to administer warnings to that defendant prior to the examination which elicited incriminating statements and the failure to notify defense counsel that the examination would encompass the future dangerousness issue. *Estelle v. Smith, supra*. In light of the facts in the instant cause not involving any lack of such warnings or notice, *Smith* is not entirely analogous. However, the State cites language in *Smith* which states that a criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. *Estelle v. Smith*, 451 U.S. at 468, 101 S.Ct. at 1876, 68 L.Ed.2d at 372. The State suggests that such language implies that a capital defendant might waive his Fifth Amendment privilege by introducing psychiatric evidence. However, we observe that *Smith* then indicated that if, after being properly warned, such a defendant refused to answer an examiner's questions, a validly ordered competency examination could proceed but on the condition that the results be applied solely for that purpose; in other words, "the State must make its case on future dangerousness in some other way." *Id.*

The State also points to language in *Buchanan v. Kentucky*, 483 U.S. at 422, 107 S.Ct. at 2917, 97 L.Ed.2d at 355, which after discussing language from *Smith* regarding a defendant asserting an insanity defense and introducing supporting psychiatric testimony, states the logical proposition that if a defendant requests such an evaluation or presents psychiatric evidence, then at the very least, the State may rebut this presentation with evidence from the reports of the examination that the defendant himself requested; i.e. the defendant would have no Fifth Amendment privilege against the introduction of that psychiatric testimony by the prosecution. Again however, it is undisputed that none of the examinations in the instant cause were for the purpose of determining competency or sanity issues.

The State also cites *Powell*, apparently based upon its language suggesting that "it m[ight] be unfair to the State to permit a defendant to use psychiatric testimony without allowing the State a means to rebut that testimony[.]" *Powell v. Texas*, 492 U.S. at 685, 109 S.Ct. at 3149, 106 L.Ed.2d at 556. However, the Supreme Court was clearly speaking in the context of a defendant raising a "mental-status defense." *Id.* As noted previously, it is undisputed that the examinations in the instant cause were not for the

purpose of determining competency or sanity issues; thus, there was no "mental-status" defense raised and the Grigson examination was not ordered as rebuttal to such a defense. Specifically, we observe that such issues were not raised at trial, in that appellant did not present any such evidence at guilt/innocence. Neither of appellant's two punishment expert witnesses, a psychologist and a psychiatrist, raised such issues. We do observe that the transcript contains a "Request For Examination of Defendant" and an "order" granting such. However there is nothing indicating that when or if such examination was conducted it raised any competency or sanity issues. Appellant asserts, and the State does not contradict, that neither competency to stand trial nor sanity at the time of the offense had been raised per Articles 46.02 and 46.03, V.A.C.C.P. Our review of the statement of fact volumes transcribing pretrial hearings also does not reveal that any competency or sanity issues were raised.[2]

## IV.

### MERITS OF CLAIM

The Fifth Amendment to the United States Constitution provides, among other things, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const., amend. V. It is very well-settled that this protection applies to defendants facing examinations seeking to elicit evidence to prove future dangerousness under Texas capital sentencing procedures. *Estelle v. Smith, supra.* Thus if appellant's statements made during the Grigson examination were compelled, then the above-quoted Fifth Amendment protection would have been violated in admitting into evidence Dr. Grigson's testimony based upon such statements.

Appellant vociferously objected to being ordered to submit to the Grigson examination. He specifically stated that he was acquiescing merely because the trial court was making the admissibility of evidence which he wanted to present be contingent upon

submitting to such examination. Appellant insisted, and the trial court acknowledged, that such acquiescence was not waiving his claim of error in being coerced into a position of making such a choice.

We note that the United States Supreme Court, admittedly in a different context, has recognized that "an undeniable tension is created" when a defendant must choose between the pursuit of one benefit under the Constitution and the consequent waiver of another. *Simmons v. U.S.,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, 1259 (1968). In *Simmons,* that defendant (actually named Garrett) had testified at his unsuccessful suppression hearing, whereupon the State thereafter presented that testimony at the trial on the merits. *Id.* at 389, 88 S.Ct. at 973, 19 L.Ed.2d at 1256. Under those circumstances, the Court said, "[W]e find it intolerable that one constitutional right should have to be surrendered in order to assert another." *Id.* at 394, 88 S.Ct. at 976, 19 L.Ed.2d at 1259. The Fifth Amendment privilege "is a bar against compelling 'communications' or 'testimony'...." *Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908, 916 (1966). That privilege is fulfilled only when the person is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will. *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653, 659 (1964); *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694, 715 (1966). Thus, a defendant has the right to remain silent and not discuss his case with anyone.

The *Simmons* rationale appears analogous in the instant cause. The trial court's requirement, at the State's urging, that appellant submit to the Grigson examination forced him, in effect, to choose between exercising his Fifth Amendment right against self-incrimination and his Sixth Amendment right to effective assistance of counsel. Like the United States Supreme Court, we find such coercion to be intolerable.

This Court has specifically held that a trial court does not have the authority to appoint

---

**2.** We do note that evidence was presented regarding appellant's I.Q. and level of intelligence.

However, such certainly was not raising legal insanity or competency to stand trial issues.

a psychiatrist for the purpose of examining a defendant for evidence relating solely to his future dangerousness, and that doing so was error. *Bennett v. State*, 742 S.W.2d 664, 671 (Tex.Cr.App.1987), *vacated and remanded on other grounds*, 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 917 (1988), *reaffirmed*, 766 S.W.2d 227 (Tex.Cr.App.1989), *cert. denied*, 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 578 (1989). In *McKay v. State*, 707 S.W.2d 23, 38 (Tex.Cr.App.1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986), this Court affirmed a prosecutor's jury argument at punishment in which he stated that he could not have that defendant examined by a named expert witness just for the purpose of answering that question (apparently referring to one of the special issues), because the law did not allow him to do so. This Court stated that because there was no issue raised to that defendant's competency to stand trial or his sanity at the time of the offense, there was no vehicle by which the State could have had the court appoint a psychiatrist to examine him; i.e. the law did not permit the State to have a psychiatrist appointed for the purpose of examining him for evidence relating solely to his future dangerousness, thus the prosecutor's jury argument was not misstating the law. *Id.* This Court even added that had that defendant been so examined, he could have prevented the State from using the evidence obtained therefrom by claiming his Fifth Amendment right against self-incrimination per *Estelle v. Smith.* *Id.*

We also observe certain language by this Court in *Hernandez v. State*, 805 S.W.2d 409 (Tex.Cr.App.1990), *cert. denied*, 500 U.S. 960, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991), which involved that defendant claiming that his Fifth Amendment privilege against self-incrimination had been violated by allowing the State to present at punishment expert testimony based upon a competency examination. This Court approved of the procedures, specifically noting that that expert "was explicitly prohibited from expressing any opinion concerning [that defendant's] future dangerousness based on his examination of [that defendant], and he did not so opine." (Footnote omitted.) *Id.* at 412. This Court also noted that that expert's testimony, "while *relevant* to the issue of future dangerousness,

was not a direct assertion of an expert opinion concerning future dangerousness." (Emphasis in original.) *Id.* at 413. The record reflects that in the instant cause Dr. Grigson's testimony based upon his examination of appellant did indeed include very direct assertions of his expert opinion concerning appellant's future dangerousness.

█ In light of the above authority, we conclude that the trial court's action in making the admissibility of portions of Dr. Wettstein's proffered testimony contingent upon appellant submitting to an examination by a State-selected expert was erroneous and such violated the Sixth Amendment to the United States Constitution. And under these circumstances the admission of Dr. Grigson's testimony based upon his examination of appellant violated appellant's Fifth Amendment right against self-incrimination. Finding such error we must conduct a harm analysis. *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *Bennett v. State*, 742 S.W.2d at 671; Tex.R.App. Pro. 81(b)(2).

## V.

### HARM ANALYSIS

█ *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) provides the initial basis for analyzing error and determining whether such was harmless. We have said that our own Tex.R.App.Pro. 81(b)(2) is the Texas codification of *Chapman*. *Cook v. State*, 821 S.W.2d 600, 605 (Tex.Cr.App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1705, 118 L.Ed.2d 413 (1992). Rule 81(b)(2) mandates that we reverse the judgment under review unless we determine beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment. As the error in the instant cause only arose at punishment, we shall limit our attention to its contribution at that stage, i.e. in the jury's answering of the special issues. It is well-settled that in answering the special issues the jury may consider all of the evidence adduced at the guilt stage. *Miniel v. State*, 831 S.W.2d 310, 322 (Tex.Cr.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 245, 121 L.Ed.2d 178 (1992);

*Fuller v. State,* 827 S.W.2d 919, 934 (Tex.Cr. App.1992). Therefore we shall likewise consider the evidence adduced at guilt/innocence in analyzing the harm at punishment.

 In *Harris v. State,* 790 S.W.2d 568 (Tex.Cr.App.1989), this Court articulated a coherent standard for determining when an error is harmless. We do not determine harmlessness simply by examining whether there exists overwhelming evidence to support the verdict, but rather calculate as much as is possible the probable impact of the error on the jury in light of the existence of the other evidence. *Id.* at 587. "A procedure for reaching this determination should: first, isolate the error and all its effects, using the considerations set out above and any other considerations suggested by the facts of an individual case; and second, ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted." *Id.* at 588. In performing the isolating analysis, we examine the source and nature of the error, whether or to what extent it was emphasized by the State, its probable collateral implications, and consider how much weight a juror would probably place upon the error and determine whether declaring it harmless would encourage the State to repeat it with impunity. *Id.* at 587.

### A. Dr. Grigson's Testimony

Dr. Grigson indicated that his examination lasted 90 minutes. He testified that he questioned appellant about the particulars of the instant offense and appellant's reactions to the judicial proceedings, including jury selection. He stated that approximately one hour and fifteen or twenty minutes of the examination "was entirely devoted to the crime itself in terms of [appellant's] behavior before the crime, . . . during the crime, and . . . after the crime[,] with maybe five . . . [or] ten minutes . . . going into [appellant's] prior record." Dr. Grigson testified in detail about what appellant had related regarding the reasons for the killing, including that appellant had shot the decedent again while on the floor. He also testified to appellant's explanation of having bought the murder weapon off the street for $25.00. Dr. Grigson testi-

fied that he inquired as to the disposition of the murder weapon, but that appellant specifically refused to reveal its whereabouts. Dr. Grigson insisted that such indicated that "obviously, th[at] gun was evidence in something else[,]" i.e. another criminal offense. He indicated that the fact that appellant would not reveal the whereabouts of the gun was extremely important. Dr. Grigson also testified about what appellant had told him about prior criminal arrests and convictions, and problems adjusting in prison. He also indicated that he had confronted appellant with the belief that this was not the first time that appellant had killed, though appellant disputed that.

Dr. Grigson opined that appellant was a "continuous liar." He also related that appellant expressed "absolutely no shame, no embarrassment, no guilt, no remorse" about the instant offense; he "absolutely guarantee[d]" that appellant had none. Dr. Grigson also indicated that he was impressed with appellant's vocabulary and responses to questioning. He stated that such indicated "clearly, absolutely, that [appellant] is of average intelligence from an intellectual standpoint[,]" and that poor school performance was "due to lack of motivation." He also indicated that he "kn[e]w" that appellant had a much higher I.Q. than tests had revealed. Dr. Grigson also testified that appellant had "the weirdest haircut" that he had seen, apparently with "lightning bolts on the side of the head."

When specifically asked about the future dangerousness special issue, Dr. Grigson testified that he had gleaned an opinion based upon the examination, reviewing some evidence and being made aware of appellant's past history records, and comparing appellant with other individuals that he had examined. Based upon those factors, Dr. Grigson opined that appellant would commit future criminal acts of violence. He further opined that appellant "very definitely presents a very serious threat to any society that he's in." He added that in his opinion appellant was "one of the most dangerous killers that [he'd] examined or ha[d] come in contact with." At the end of the State's direct examination, Dr. Grigson reiterated that he "ha[d]

absolutely no doubt whatsoever ... [and] [he] c[ould] guarantee ... [that appellant] w[ould] commit continuing acts in the future, distant and far." Dr. Grigson clearly stated that his opinions were at least partially based upon the various things that appellant had told him during the examination.

### B. Other Evidence

The State also presented expert psychiatric testimony from Dr. Rennebohm. He testified that he had never examined appellant, but rather expressed opinions in response to a rather lengthy hypothetical question. His opinion was that the person described in the hypothetical had a sociopathic personality disorder. He added that such a person would be counted as "high level sociopathy, severe antisocial attitude." He indicated that the prospects for change in such person was almost nonexistent. He also explicitly opined that the subject of the hypothetical "would constitute significant hazard or a threat to others in a confinement situation." He did not expect the person in the hypothetical to diminish in danger.

As noted initially, the instant offense involved the armed robbery of a grocery/convenience store in which a store security guard was shot to death. We have reviewed the evidence at guilt/innocence, including appellant's confession and the videotape which confirmed the confession.

At punishment the State also presented testimony from a former jail inmate to whom appellant had offered money to have one of the witnesses killed, and indicated that he had committed multiple robberies and had acquired such money. That former inmate testified that killing the witness had initially been discussed when he was in jail with appellant, but that appellant then called him again making such offer after he had gotten out. He also testified that appellant had laughed about having taken some necklaces from other inmates.

The State also presented evidence of appellant's prior convictions for burglary of a building and robbery. There was also evidence of various disciplinary violations which he had had in prison. Several witnesses testified as to appellant's bad reputation.

There was also testimony about him committing several offenses, including various traffic violations, pulling a knife on a person interceding during a theft, breaking into a school and stealing food, and twice turning up inside a neighbor's house, apparently uninvited, in the middle of the night. Various people from the juvenile and adult probation system, and from the prison and parole systems, testified about appellant.

### C. Application of *Harris* Factors

As discussed above pursuant to *Harris, supra,* we must first isolate the error and all its effects. The nature of the error in the instant cause was erroneously requiring appellant to submit to the Grigson examination in order to present his testimony based upon the Wettstein examination. This resulted in Dr. Grigson's testimony based upon his examination. The source of the error was the State managing to convince the trial court to make the admissibility of appellant's evidence from the Wettstein examination contingent upon his submitting to the Grigson examination. As the evidence was very much focused upon the punishment special issues, we do not perceive any probable collateral implications.

Dr. Grigson was the very last witness to testify. Both the State and appellant immediately thereafter rested and closed. The State's opening argument at punishment did not mention Dr. Grigson's testimony. The State's closing argument only briefly discussed his testimony. The prosecutor stated that Dr. Grigson is "a very strongly opinionated man" and suggested that if the jury wanted to disagree with him, then it could throw his opinions out. However, the prosecutor reminded them that even in disregarding Dr. Grigson's opinions, it could not disregard the facts.

As noted above, the State did not place heavy emphasis upon Dr. Grigson's testimony during the punishment jury argument. Nevertheless, as the prosecutor himself observed, Dr. Grigson expressed some extremely strong opinions regarding appellant. Dr. Grigson's experience and expertise was also made very clear to the jury when he

testified. As noted previously, he was the last witness to testify, and there was a very powerful content to his message. In light of such, including the strength and adamancy of the testimony, it is probable that the jury likely placed great weight on Dr. Grigson's testimony.

A finding that this error is harmless might encourage the State to repeat it with anticipated impunity, or at least not discourage the repetition of such. Though we think it likely that prosecutors will henceforth be aware of the danger of coercing a defendant to submit to an examination in the capital murder punishment setting, declaring such error harmless might be misinterpreted as tacit approval of such by this Court. Such an interpretation might very well lead to repetition of the error.

After so isolating the error and its effects, we must ask whether a rational trier of fact might have reached a different result if the error and its effects had not occurred. *Harris, supra.* We point out that we are not measuring the sufficiency of the evidence to sustain the jury's answers to the special issues, but rather are, pursuant to Rule 81(b)(2), determining whether we can conclude, beyond a reasonable doubt, that the error did not contribute to the jury's answers at punishment. This point was emphasized by the United States Supreme Court in *Satterwhite v. Texas,* 486 U.S. at 258, 108 S.Ct. at 1798, 100 L.Ed.2d at 295 in stating that the question is "whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained[,]' " rather than whether the legally admitted evidence was sufficient to support the death sentence. We observe that this Court had incorrectly found similar error in admitting testimony of Dr. Grigson to be harmless beyond a reasonable doubt because the properly admitted evidence was such that the minds of an average jury would

have found the State's case sufficient on the future dangerousness special issue even if Dr. Grigson's testimony had not been admitted. *See Satterwhite v. State,* 726 S.W.2d. 81, 93 (Tex.Cr.App.1986). However, the United States Supreme Court found otherwise and reversed this Court's decision. *Satterwhite v. Texas,* 486 U.S. at 260, 108 S.Ct. at 1799, 100 L.Ed.2d at 296. It specifically held that it found it "impossible to say beyond a reasonable doubt that Dr. Grigson's expert testimony on the issue of Satterwhite's future dangerousness did not influence the sentencing jury." *Id.*[3]

## CONCLUSION

After reviewing the record in the instant cause and applying the above-described *Harris* analysis, and being guided as we must by the United States Supreme Court, we likewise find it impossible to conclude, beyond a reasonable doubt, that Dr. Grigson's expert testimony on the issue of appellant's future dangerousness did not contribute to the jury's answering of the future dangerousness special issue at punishment. *Cook v. State,* 821 S.W.2d at 605; *Wilkens v. State,* 847 S.W.2d 547, 554 (Tex.Cr.App.1992). A rational trier of fact might have reached a different result if the error and its effects had not occurred.

Accordingly, because no separate punishment hearing is authorized for error occurring at the punishment stage of a capital murder trial, appellant's conviction is reversed and the cause remanded to the trial court. *Satterwhite v. State,* 759 S.W.2d 436 (Tex.Cr.App.1988).[4]

CLINTON, J., not fully satisfied that the competing constitutional right has been correctly identified, joins only the judgment of the Court.

---

3. We note that while *Satterwhite* involved a violation of the 6th Amendment's right to assistance of counsel, rather than the Fifth Amendment's self-incrimination protections, such error resulted in Dr. Grigson's testimony being improperly admitted into evidence as in the instant cause. Thus the United States Supreme Court's discussion and treatment of harm is analogous.

4. We note that Article 44.29(c), V.A.C.C.P. now provides for a new punishment hearing alone when a capital murder conviction is reversed due to error affecting punishment only. However, that Act provided that this change only applies to offenses committed on or after September 1, 1991. As previously noted, the instant offense was committed on December 29, 1988.

CAMPBELL, Judge, dissenting.

Today, a majority of this Court concludes that appellant should be granted relief based upon grounds that I believe to be bereft of merit. Therefore, I cannot agree with the rationale of the majority.

During the punishment phase of the trial, the State introduced the testimony of Dr. John Rennebohm. Rennebohm never examined appellant, but testified in reference to a hypothetical situation that encompassed the facts of this case. From that hypothetical situation, Rennebohm concluded that the person described was a sociopath who had almost no realistic chances for improvement. After Rennebohm concluded his testimony, appellant called Dr. Robert Wettstein as a witness. The State requested and received a hearing outside of the presence of the jury. At that hearing, the trial judge decided that Wettstein could testify about the inaccurate nature of predictions of future dangerousness, but could not testify about anything he had learned about appellant from examining appellant. After numerous objections and arguments,[1] the State and appellant agreed to let Wettstein testify about what he had learned from examining appellant in exchange for appellant submitting to an examination by Dr. James Grigson, with Wettstein in attendance. Appellant made it known that he agreed to this compromise *only because the trial court was going to limit Wettstein's testimony otherwise.*

At trial, Wettstein testified during the punishment phase. During cross-examination, the prosecutor elicited responses from Wettstein concerning what appellant had said to Wettstein during Wettstein's evaluation of appellant. Wettstein answered questions regarding what appellant had said about the commission of the crime. Appellant lodged no objections to Wettstein's testimony or to the State's questions regarding what appellant had said to Wettstein concerning the commission of the offense. The State also placed into evidence, without objection from the appellant, the notes Wettstein had taken during his evaluation of appellant. These notes also contained statements that appellant had made to Wettstein about the commission of the offense. The State offered Grigson's testimony in rebuttal to that of Wettstein.

At the outset, the majority relies upon *Bennett v. State,* 742 S.W.2d 664 (Tex.Cr. App.1987). While this Court did state that the "trial court does not ... have the authority to appoint a psychiatrist for the purpose of examining a defendant for evidence relating solely to his future dangerousness," 742 S.W.2d at 671, I do not find the *Bennett* case dispositive.

In *Bennett,* the appellant had already been examined concerning his sanity. The State requested that another exam be conducted by Grigson because the first psychiatrist was unavailable to testify. That is not the situation facing the Court in this case. Here, appellant was trying to put on evidence in support of the proposition that he did not constitute a threat of future dangerousness. The State offered Grigson's testimony in rebuttal to that of Wettstein. Therefore, other than for the proposition above quoted, the holding in *Bennett* is useless.

The majority, relying upon *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), then concludes that the trial court erred in allowing Wettstein to testify on the condition that appellant be required to submit to an evaluation by a psychiatrist chosen by the State (Dr. Grigson). The facts underlying *Smith,* however, differ materially from those involved in this case.

In *Smith,* as in *Bennett,* the defendant had introduced no psychiatric evidence and had given no indication that he intended to do so. *Id.* 451 U.S. at 466, 101 S.Ct. at 1874. Also, the defendant submitted to an examination by the State's psychiatrist, Dr. Grigson, without being warned of his Fifth Amendment rights. *Id.* at 467, 101 S.Ct. at 1875. In *Smith* "the State offered information obtained from the court-ordered competency examination as *affirmative* evidence to per-

---

1. The State argued against permitting Wettstein to testify about anything he had learned from examining appellant because the State had not been allowed to examine appellant. Appellant objected and prolonged discussions followed.

suade the jury to return a sentence of death." *Id.* (Emphasis added). In this case, the State was allowed to examine appellant because appellant was going to introduce Wettstein's testimony that future dangerousness could not be accurately predicted. The trial court's actions in this regard are in no way violative of the Supreme Court opinion in *Smith.* There, the Supreme Court expressly wrote that

> [w]hen a defendant asserts the insanity defense[2] and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist. See, e.g., *United States v. Cohen,* 530 F.2d 43, 47–48 (CA5), cert. denied, 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *Karstetter v. Cardwell,* 526 F.2d 1144, 1145 (CA9 1975); *United States v. Bohle,* 445 F.2d 54, 66–67 (CA7 1971); *United States v. Weiser,* 428 F.2d 932, 936 (CA2 1969), cert. denied, 402 U.S. 949, 91 S.Ct. 1606, 29 L.Ed.2d 119 (1971); *United States v. Albright,* 388 F.2d 719, 724–725 (CA4 1968); *Pope v. United States,* 372 F.2d 710, 720–721 (CA8 1967) (en banc), vacated and remanded on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968).

*Id.* 451 U.S. at 463, 101 S.Ct. at 1874. (footnote omitted).

The decision in *United States v. Cohen,* supra, cited in *Smith,* was discussed by a panel of the Fifth Circuit Court of Appeals in *Battie v. Estelle,* 655 F.2d 692, 701 (5th Cir.

1981). The panel in *Battie* noted how the prosecution in *Cohen* had introduced the results of a court-ordered psychiatric examination only after the defense had introduced psychiatric testimony to raise a mental-status defense. *Battie,* 655 F.2d at 701. By introducing psychiatric testimony, the defendant had waived his Fifth Amendment privilege in the same manner as would the defendant who elected to testify at trial. *Id.* at 701–702. The rationale underlying this conclusion of waiver was that "[b]y introducing psychiatric testimony obtained by the defense from a psychiatric examination of the defendant, the defense constructively puts the defendant himself on the stand and therefore the defendant is subject to psychiatric examination by the State in the same manner." *Id.* at 702 n. 22. See also *Pope v. United States,* 372 F.2d 710 (8th Cir.1967).

While the facts previously outlined strongly indicate, at the very least, an "implied" Fifth Amendment waiver, there is additionally a strong indication of an express waiver on the part of appellant. Appellant lodged no objections when the State elicited responses from Wettstein concerning what appellant said in regard to the circumstances of the offense. Wettstein's notes containing appellant's statements were admitted without objection by appellant. Therefore, the testimonial nature of appellant's statements to his own witness were before the jury in a way totally unconnected to the testimony of Grigson.

Moreover, the State elicited this testimony from Wettstein before Grigson even took the witness stand. Appellant's objection to being subjected to an examination by Grigson is unrelated in any way to appellant's failure to

---

**2.** The majority seems to see some kind of difference between whether a defendant advances a mental-status defense to the entire prosecution (i.e. insanity or incompetency) or adduces some kind of defensive evidence for a more limited purpose (i.e. to prove only that the defendant does not constitute a future danger). In my view, this is an arbitrary distinction. As I understand the role of psychiatric testing, there is not some specialized exam for sanity or competency as opposed to another specialized exam for future dangerousness. There is certainly no evidence in the record to indicate that different types of tests are administered for determining

sanity or competency as opposed to determining likelihood of future dangerousness. See *Diagnostic and Statistical Manual of Mental Disorders* (Third Ed.—Revised, 1987) pp. 15–16 wherein it is explained that

> [e]ach person is evaluated on each of these axes:
> Axis I Clinical Syndromes and V Codes
> Axis II Developmental Disorders and Personality Disorders
> Axis III Physical Disorders and Conditions
> Axis IV Severity of Psychosocial Stressors
> Axis V Global Assessment of Functioning.

object to the testimonial aspects of his examination by Wettstein, about which Wettstein testified. Therefore, appellant waived any Fifth Amendment claim of privilege because his failure to object to his own witness' testimony about the offense constructively placed appellant himself on the witness stand. See *Battie v. Estelle*, 655 F.2d 692, 702 n. 22 (5th Cir.1981).

In *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Supreme Court adopted more of a public policy stance, impliedly, at least, eschewing the waiver notion found in the circuit opinions cited in *Smith*, ante. In *Buchanan*, the Supreme Court discussed *Smith v. Estelle*, supra, and specifically "recognized the ... 'distinct circumstances' of [the *Smith* ] case ..."[3] 483 U.S. at 422, 107 S.Ct. at 2917. A majority of the Court specifically stated that in *Smith* they had "acknowledged that, in other situations, the State might have an interest in introducing psychiatric evidence to rebut [a] petitioner's defense ..." *Id.* The Court specifically held that

if a defendant requests such an evaluation [i.e. a sanity evaluation] or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested.

*Id.* at 422–423, 107 S.Ct. at 2917–18.

It is probably not a coincidence that, in *Buchanan*, the Supreme Court cited to *United States v. Byers*, 740 F.2d 1104 (D.C.Cir. 1984) in reaching its decision. In *Byers*, and to a lesser degree in *Pope*, supra, the issue was framed in terms of "the process of determining where the right to remain silent ends and the society's need to require testimony begins." *Byers*, 740 F.2d at 1114. As was so eloquently stated in *Brown v. United States*,

356 U.S. 148, 155–156, 78 S.Ct. 622, 626–627, 2 L.Ed.2d 589 (1958), which was quoted in *Byers*,

a defendant cannot reasonably claim that the Fifth Amendment gives him not only this choice [whether to testify or not] but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell.... The interests of the other party and regard for the function of the courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.

*Byers*, 740 F.2d at 1114.

The question remaining is whether the *Buchanan* decision should be extended to a psychiatric evaluation performed for the purpose of rebutting a defendant's claim regarding future dangerousness. As I explained in footnote two, I see no distinction between compelling a defendant to submit to a mental-status examination as opposed to an examination pertaining to future dangerousness, and the arguments advanced in *Byers*, *Buchanan*, and *Brown* well support this notion. And I believe that this strikes at the heart of the majority's thesis—that since no mental-status examination was involved, *Buchanan* does not apply. This premise misses the entire rationale explicated in *Buchanan*, *Byers*, and *Brown*. It is not the nature or name of the psychiatric test involved that is important. The only inquiry is whether the Fifth Amendment privilege is applicable. Under the facts of this case, it is obvious 1)

---

**3.** In *Buchanan*, the Supreme Court distinguished its prior holding in *Smith*. The Supreme Court explained that the State's conduct in *Smith* had violated the petitioner's Fifth Amendment rights because Grigson's prognosis of future dangerousness "was not based simply on his observations of the defendant, but on detailed descriptions of Smith's [the defendant] *statements* about the underlying crime." *Buchanan*, 483 U.S. at 421, 107 S.Ct. at 2916. (Emphasis in original). This fact rendered Smith's comments to Grigson "testimonial in nature" and made Grigson's conduct

in testifying about those comments "essentially like that of an agent for the State recounting unwarned statements in a postarrest custodial setting." *Id.* at 422, 107 S.Ct. at 2917. Since Smith had not been warned of his *Miranda* rights prior to being examined, Grigson's testimony constituted a violation of Smith's Fifth Amendment rights. *Id.*

As an aside, we also note that in *Smith*, the Supreme Court found a Sixth Amendment violation. No such violation, however, is alleged in this case.

that appellant expressly waived his privilege and 2) that the public policy dictates of *Buchanan* apply to the proffer of evidence pertaining to future dangerousness.

Based upon my belief that the trial court's actions constituted no error, I would overrule appellant's points of error eleven through fourteen. The majority fails to so conclude, and, therefore, I dissent.

McCORMICK, P.J., and WHITE and MEYERS, JJ., join.